Isaac H. McClellan et al. v. Robert N. Owens et al., Appellants. —74 S. W. (2d) 570.

Division One, September 18, 1934.

*Jacob M.* and *Arthur V. Lashly* for appellants.

*Foristel, Mudd, Blair & Habenicht* for respondents.

STURGIS, C.—The object of this suit brought in the circuit court is to have a decree declaring the probate of the will of John W. McClellan, a negro physician and surgeon of St. Louis, Missouri, declared null and void. Such will is alleged to have been lost or destroyed and a copy of the same was presented to the Probate Court of the City of St. Louis and on proof made was admitted to probate. Thereupon the plaintiffs, brothers, sisters and nieces, heirs at law of the deceased, who had no children or descendants, instituted this suit alleging that John W. McClellan died intestate and that the probated copy of his will was not a copy of any last will of the deceased. The sole beneficiary, except merely nominal, of the probated will is the defendant Fisk University of Nashville, Tennessee, an institution for the higher education of colored youths. The other defendants are the executors of the will and two nieces of testator who refused to become plaintiffs' but who on the trial joined plaintiffs in asking that the probated will be set aside. On the issues framed by the pleadings defendants became the proponents of the probated will and the plaintiffs the contestants. The issue on trial was whether John W. McClellan died testate and whether the probated will was a true copy of his last will and testament. The case was tried before a jury, which returned a verdict in favor of the defendants sustaining the will. The trial court sustained plaintiffs' motion for new trial and the defendants have appealed.

It appears from the record here that testator, John W. McClellan, a successful negro physician and surgeon, died in St. Louis on December 17, 1927, possessed of an estate, real and personal, of the estimated value of $100,000. He left no children or descendants, never having been married. It was known that he had made his will naming defendants Owens and Inge as executors but no will could be found among his papers and effects. It was known that defendant Owens, a lawyer of St. Louis, had drawn his will, keeping a carbon copy, but on diligent search after testator's death no will could be found. When the witnesses to the will were located the carbon copy retained by Attorney Owens was presented in the probate court, proof of the due execution of the original was made, its loss shown, and probate was granted. This suit followed and on the evidence and instructions given the jury returned a verdict finding that the instrument in writing offered in evidence, dated March 16, 1927, purporting to be a true copy of the last will and testament of John W. McClellan, deceased, is a true copy of the last will of said McClellan. Motions for new trial were filed by plaintiffs contesting the will and pending such motions the regular judge who tried the case died and his successor was duly appointed and qualified.

Such successor judge heard the motions for new trial and sustained the same on the specific ground that the verdict is against the evidence, is not supported by the evidence, and because the court erred in not sustaining a demurrer to the evidence and directing a verdict for the plaintiffs, contestants of the will, and erred in giving to the jury each and all the instructions for defendants, proponents of the will, submitting the issue of will or no will to the jury.

The point is made by appellants that the judge who passed on the motions for new trial and granted the same, not being the judge who heard the evidence and held it sufficient to take the case to the jury, could not grant a new trial on the ground that the verdict is against the weight of the evidence, but could not do otherwise than refuse a new trial on that ground. That question, however, is not here for decision for the reason that it is apparent from the court's ruling as a whole that he did not in fact grant a new trial on the ground that, having weighed the evidence in support of and against the verdict, the verdict was against the greater weight of the evidence. The record recites that the court granted the new trial because he should have sustained the demurrer to the evidence and directed a verdict against defendants as proponents of the will, which means that there was no substantial evidence in favor of the verdict sustaining the will. Such also is the meaning of that part of the court's ruling holding that no instructions should have been given submitting the issue of will or no will to the jury. The order of the successor judge granting a new trial is in effect a holding that there was no substantial evidence supporting the verdict. [Crawford v. Stock Yards, 215 Mo. 394, 402, 114 S. W. 1057.] The ruling of the trial court in granting a new trial, therefore, presents purely a question of law and the successor of the judge who heard the evidence had the power to pass on that question and sustain the motion. [State ex rel. Cosgrove v. Perkins, 139 Mo. 106, 117, 40 S. W. 650; Richardson v. Agricultural & Mechanical Assn., 156 Mo. 407, 412, 57 S. W. 117; Thompson v. Railroad, 270 Mo. 87, 94, 192 S. W. 1034; State v. Messino, 325 Mo. 743, 754, 30 S. W. (2d) 750.] The respondents, contestants of the will, concede that the motion for new trial was in fact granted because the judge hearing same reached the conclusion that there was no substantial evidence sustaining the jury's verdict, and concede that the only question presented to this court is that of the sufficiency of the evidence to warrant a verdict and judgment establishing the writing produced as the last will of John W. McClellan, deceased. The burden was on defendants, as proponents of the lost will, to establish its due execution, its contents, and that it was lost and destroyed with no intent of the testator to revoke it, and both parties concede that the only question here is the sufficiency of the evidence to take that question to the jury.

The defendants, as proponents of the lost will, assumed the burden

of proof and introduced evidence proving or tending to prove these facts: The deceased maintained his office and sleeping room on Pine Street in St. Louis. He became acquainted with defendant Robert N. Owens, a lawyer there, and advised with him more or less in regard to business matters. In April, 1927, he requested Owens to draw up his will for him. Owens told him to write out a memorandum giving him a list of his property and the persons to be made beneficiaries. Testator did this and Owens used the memorandum in drawing up the will and then preserved such memorandum and a carbon copy of the will in his files. This memorandum, as does the probated will, designated Fisk University, Nashville, Tennessee, as the sole beneficiary. In explanation of this Owens testified that testator told him that he had attended school and graduated at Fisk University and felt that he owed to a great extent all that he had to that institution; that while attending school there he was not able to pay his way through school and that the president of that institution had not permitted him to quit school for want of funds but made it possible for him to continue in school till graduation with no prospect of the aid given him being repaid except his own promise that if he made good he would some day do for other negro youths what had been done for him; that Fisk University had been founded and maintained by the philanthropy of white people but it was now up to the negroes who had been educated there to see that the school was maintained for the future. The principal clause in the will offered for probate gives to Fisk University practically all of testator's property, to be "used by the said university in the interest and on the behalf and for the benefit of the higher education of the negro youth of this country." On Owens' inquiry and suggestion the testator gave Owens a list of his brothers and sisters and a clause in the will gives to each by name the sum of one dollar. As to them, testator said, "They are grown. They work for themselves and I am not going to permit my money to be flittered away" in automobiles, etc. "I worked hard for my money, didn't spend it that way myself, and I am not going to let anybody else spend it." There was evidence of other witnesses, including some for plaintiffs, that testator had frequently expressed his intention to give part at least of his property to Fisk University. The will, including a certificate of attesting witnesses, was then drafted by Owens and delivered to testator, who read it over, approved it and said he would execute it before witnesses as instructed. A short time thereafter testator told Owens he had signed and executed it, and knowing that Owens was one of the executors, he and Owens on several occasions discussed to some extent the best method of handling the real estate in the interest of the University. Owens never saw the original of the will after its execution, nor did anyone other than testator himself. The testator kept a small safe in his office in which he kept insurance

policies, deeds, bank books, etc. His death occurred at his sleeping room adjoining his office rather suddenly on Saturday night, December 17, 1927, and three days before this he had a talk at his office with an old friend and schoolmate, Ernest Patillo, a deputy clerk in one of the city courts, whom he had not seen for a long time, and they talked about the fact that testator had recently been in a hospital for treatment, as had been his friend Patillo. Testator told him that while he looked well, he had a "bad heart." This led his friend to suggest that it might be well for testator to get his business shaped up and on being told that he had that attended to, he was asked if he had his will made, to which testator replied, "Yes, Owens drew that up a long time ago," and pointing to the safe, said, "It is in there, in the safe." When testator died three days later and this safe was opened under the circumstances hereinafter mentioned, the will was not found and could not be found anywhere after diligent search. The executors named in the will believing it would be found, took charge of the property. It was not known for some little time who had signed the will as witnesses, but it became known that the testator took the will to a hospital with which he was connected and had it witnessed by two nurses who worked there and knew testator quite well. These witnesses testified to the due execution of the will—that Dr. McClellan produced a writing with his signature thereto, which the witnesses recognized, and told them that it was his will, that he had signed it, and asked them to sign as witnesses, which they did in his presence on the blank lines below the attestation clause. They identified the proffered carbon copy as being a copy of the will they witnessed at testator's request, though admitting that they did not read the will or know its contents at the time they signed as witnesses. That, however, was not an essential fact but affects only the question of identification.

Plaintiffs insist that in order to sustain the probate of the proffered copy of the will as and for the will of testator, the burden of proof was on the proponents of the will to prove (1) that John W. McClellan made and executed in due form as provided by law a will and published the same as and for his last will and testament; (2) that such will was not destroyed by him but was in existence at the time of his death; (3) that the paper presented to the probate court and there probated in common form as and for the last will and testament of John W. McClellan was and is a true copy of the very paper witnessed by the two witnesses. We agree that in this the plaintiffs are correct. They, however, admit that there is substantial evidence to sustain the first proposition mentioned, so that we need not dwell on that further. Nor do plaintiffs seriously controvert the sufficiency of the evidence to sustain the last proposition, that the carbon copy produced for probate is a true copy of the very writing witnessed by the two nurse witnesses in the presence of Dr. Mc-

Clellan and at his request. The witnesses never signed but one such writing for testator and he declared it to be his last will and testament. They testified that they were able to identify the carbon copy from its appearance and earmarks as being a carbon copy of the original will which they signed and gave back to Dr. McClellan. In addition to this, the witness Owens, who drafted the will and who kept and produced the carbon copy, testified that he gave this original to testator, who read and approved of it at the time and said he would have it witnessed and shortly thereafter told him (Owens) that he had signed the will which he (Owens) had prepared and had had it witnessed by the necessary witnesses. He also told his friend Patillo three days before his death that he had made his will, that *Owens had prepared it for him* some time previous, and that it was then in his office safe, pointing to it at the time. This evidence, if believed, left little, if any, doubt as to the genuineness of the proffered carbon copy being the same as the lost original, the due execution of which plaintiffs concede the evidence is sufficient to show. The trial judge who sustained the motion for new trial in his memorandum opinion said: ''I find ample evidence to the effect that Dr. John W. McClellan executed his last will and signed the same in the presence of witnesses and published it as such; that it was duly witnessed according to law by two subscribing witnesses and that the copy in evidence is a true copy of his last will and testament. There is evidence also to the effect that he kept this will in his iron safe in his office and that he had possession of it in the safe up to Tuesday or Wednesday before he died on Saturday night. In other words, there is sufficient evidence to show that the will was retained by the testator in his possession during all of the time after its execution until two or three days before his death.''

█ The serious point in the case is presented by the fact that this last will duly executed was shown to have been in the possession of the testator, Dr. McClellan, some three days before his death, but that after his death it could not be found by diligent search. The law is that if a duly executed will remains in the possession of the testator and after his death the will cannot be found, the presumption is that testator destroyed the will with intent to revoke it. This presumption that the will was destroyed by testator *animo revocandi* is a rebuttable one, but if no sufficient evidence is produced to rebut and overcome this presumption, then the presumption must prevail as a fact. [28 R. C. L., p. 384, sec. 388; 40 Cyc. 1280, 1281; McMurtrey v. Kopke (Mo.), 250 S. W. 399, 401; Hamilton v. Crowe, 175 Mo. 634, 647, 75 S. W. 389; Mann v. Balfour, 187 Mo. 290, 305, 86 S. W. 103.]

The evidence here is that testator, Dr. McClellan, was in possession of his will after its execution and that same was in his office safe three days before his death, when it was found to have dis-

appeared. As to its disappearance the evidence is to the effect that when testator was found dead in his office bedroom about midnight on Saturday night, some doctors were called and a number of friends assembled there. Among those who came to the death chamber was his brother, Oral McClellan, also a practicing physician in St. Louis and at times associated with deceased in professional work. The deceased's body was shortly taken charge of and removed by an undertaker and everybody left the office and adjoining bedroom except the brother, Dr. Oral McClellan, and a Dr. King, a young physician who had been staying in testator's office as a friend and assistant for several months. Dr. King testified that after all had left besides him and deceased's brother, this brother proceeded to examine all the deceased's effects, examining the pockets of his clothing, opening the drawers of his desks, looking through his papers, etc., or, as he says, completely "ransacked" the premises. The deceased's money purse and billfold, each containing some money, together with a wrist watch, his keys and other articles of personal property, were taken by this brother. This brother also inquired of Dr. King if he knew the combination of the office safe and on receiving a negative answer he proceeded to load the safe into his automobile and removed it to his own residence. The next day he procured a safe expert and had the safe opened at his residence when no one was there except his wife, who did not testify. His excuse for doing this was that it was necessary for him to see an insurance policy which he was sure was in the safe in order to ascertain the exact age of the deceased for the use of the undertaker. On demand of the executors the safe was returned to the deceased's office and by direction of the executors and a representative of the probate court, unwittingly, the same safe expert was called to open the safe a second time. This brother of deceased, though present, in no way disclosed that he had previously had the safe opened and its contents examined, but denied having done so. Without going into detail, it appears that this brother made a number of contradictory statements in reference to the opening of the safe, why he did so, and what he found there. Other private papers of the deceased such as deeds, bank books, etc., disappeared in this connection and either could not be found or reappeared some time later at the deceased's office in a mysterious manner. This brother denies that he saw or handled his brother's will in any manner. Plaintiffs' contention is that this evidence, while raising a strong suspicion that this brother found and destroyed the will in question, yet it is not sufficient to prove that fact—that a motive and opportunity to destroy the will is not sufficient to rebut and overcome the presumption that the deceased himself destroyed the will *animo revocandi*. We think, however, that this is a too narrow view of the question presented to the jury and to this court. It was not incumbent on

the proponents of this will to show the exact manner in which or the particular person by whom the will was taken and destroyed. Plaintiffs' own statement of what defendants are required to prove is that such will after being executed was not destroyed by testator with the intent to revoke it. Such is the effect of Section 520, Revised Statutes 1929.

The plaintiffs concede that it is a settled law in this State that declarations of the testator made after the due making and execution of the will are competent evidence to show that the lost and missing will was not destroyed by testator with the intent to revoke the will. In the recent case of McMurtrey v. Kopke (Mo.), 250 S. W. 399, a case much similar to this one, this court reviewed the authorities and said: "By the great weight of authority the rule is firmly fixed that, where the formal execution of a will is shown, and such will shown to have been in the custody of the maker, but could not be found at his death, then the statements of the testator tending to show the continued existence of the will are competent to *rebut* the presumption of revocation occasioned by the failure to find the will at the death of testator. The evidence mentioned supra was therefore competent." In the present case not only did witness Owens testify that testator told him soon after he had prepared it that he had executed the will before the necessary witnesses, but at various times thereafter he discussed how the executors could best handle parts of the real property for the best interests of Fisk University, and just a few days before his death, knowing that his life might end at any time, testator assured his friend Patillo that he had made his will, which was then in his safe, and disposed of his property at his death in the way he wanted it to go. As said in the McMurtrey case of similar declarations made by the testator shortly prior to his death, "such facts showed that testator had not then and did not intend to change or revoke his will."

It is insisted, however, that the court in the McMurtrey case, as well as in Hamilton v. Crowe, 175 Mo. 634, 75 S. W. 389, and Mann v. Balfour, 187 Mo. 290, 86 S. W. 103, held that while such declarations of the testator are *competent* as tending to show that testator did not himself destroy the will with the intent to revoke it, yet that such declarations standing alone are not *sufficient* to prove such fact and thereby rebut the presumption otherwise prevailing, but are only sufficient when taken with other evidence or circumstances tending to show the same thing. Plaintiffs state their position thus: "We respectfully submit that, upon these authorities, the rule in Missouri is that such declarations are not sufficient alone to overthrow the presumption under consideration, but requires other and further substantial proof tending to overthrow the presumption. Respondents contend that there was no such evidence. Appellants

also cite, in addition to the McMurtrey case, In re Schnebel's Will, 141 Atl. 313; Page v. Maxwell, 8 N. E. 852, 854; In re Steinke's Will (Wis.), 70 N. W. 61, 62, in support of their proposition that the declarations of the testator are sufficient of themselves to overthrow the presumption of destruction by the testator. Other cases may be found from other jurisdictions of like effect, but respondents submit that those cases are not authority to sustain the appellants here, first, because they are in conflict with the Missouri cases reviewed by us, and secondly, because the peculiar facts of this case take it out of the rule of the cases cited and relied on by appellants.'' We do not so read or construe the McMurtrey case or Hamilton v. Crowe, and Mann v. Belfour, supra, as holding that declarations of the testator made after his will has been duly executed, and which cannot be produced because lost or destroyed but whose contents and due execution have been established, are never sufficient in and of themselves to rebut the presumption that testator himself destroyed the will with intent to revoke it. In fact, the McMurtrey case plainly says that the weight of authority is that such statements are ''competent to *rebut* the presumption of revocation occasioned by the failure to find the will at the death of testator.'' Defendants concede that many authorities so hold and we find no reason for saying that the Missouri cases are in conflict. In fact, the McMurtrey case quotes with approval the statement of the law in 40 Cyc., page 1317, that ''Testator's declarations are, *as a rule*, admissible to *control* the presumption of revocation arising from nonproduction of the will, but in some jurisdictions only in corroboration of other evidence.'' Also this statement of the law in 28 Ruling Case Law, section 387, page 387, is there quoted with approval: ''It has been held by some courts that declarations of a testator to the effect that he was well satisfied with his will are not admissible, in conjunction with the testimony of witnesses who had seen it, to overcome the presumption of revocation which follows from the fact that the will was last seen in his possession when he was mentally sound, but the weight of authority is to the effect that the declarations of the testator may be shown, for the purpose of *overcoming the presumption* that a will has been destroyed *animo revocandi*, which arises from failure to find such a will after the testator's death. His declarations may *also* be received as evidence *to strengthen* and fortify the presumption that he has destroyed his will with such intention.''

But even if the law be as plaintiffs contend, then we find present in this case the same kind of additional evidence and corroborating circumstances which were present in the McMurtrey case and which, together with the declarations of the testator, were held sufficient to rebut the presumption that the testator himself destroyed the will with the intent to revoke it. This court in that case said: ''In addition to this evidence we have the fact that deceased lived

with his mother for a great many years; that their relationship was close; that she was then old; that the will shown to have been executed made provisions for this mother, which facts would tend to leave the inference that there was no reason to revoke this will, and thus leave the whole estate to the daughter.

"In addition to the foregoing it appears that in the search for the will the residence was searched, boxes in two banks were searched, and a locked roll-top desk in the barn was searched. Although the search was thorough, yet no will was found. But some of his deeds were likewise not found. In the locked desk at the barn there was found a $5000 life insurance policy, which was afterward paid. The papers in this desk were much mutilated by mice, and, according to one witness, some of them were wholly cut to pieces, whilst others were only partially destroyed, and some, as the insurance policy, was uninjured." It was shown here that testator had the same moral feeling and obligation toward Fisk University that the testator had in the McMurtrey case towards his mother and much the same incentive to give his property to its support. In addition to this, there is the suspicious circumstance of testator's brother removing at night the office safe, in which the will was shown to have been three days before testator's death, and having it there opened by an expert. It is true that the removal of this will from the safe and its destruction in this manner would constitute a crime and the law does not presume the commission of a crime. The court and jury, however, were not trying Dr. Oral McClellan for the commission of the crime of stealing or embezzling this will and it is not necessary for us to say whether the evidence is sufficient to sustain a conviction of such offense. [Rothschild v. American Cent. Ins. Co., 62 Mo. 356, 361; Rice v. Detroit F. & M. Ins. Co. (Mo. App.), 176 S. W. 1113, 1119.] It was a circumstance, however, of as much probative value as the destruction by mice of certain other papers of the deceased in a desk where the will might have been, as mentioned in the McMurtrey case, to be considered by the jury along with the other evidence. We hold, therefore, that the evidence was sufficient to take to the jury the question of whether deceased himself destroyed the will in question with intent to revoke it, and that the trial judge properly overruled the demurrer to the evidence and refused to instruct the jury to find for plaintiffs. The instructions given for defendants submitting this question to the jury are not criticised except for want of sufficient evidence on which to base same and that objection is not tenable.

Plaintiffs insist that there is a valid ground for granting them a new trial not mentioned by the trial judge in his order sustaining the motions for new trial. This ground is the refusal of the judge trying the case to require the witness Owens to answer questions as to his religious belief. The witness was asked on cross-examination

if he believed in Jesus Christ, to which objection was made and sustained, and the judge announced that no religious question could be inquired into. Plaintiff then offered to prove by the witness himself, if so allowed, that he did not believe in God or a Deity and was an infidel. This offer was rejected. Plaintiffs concede that the lack of belief in a Supreme Being did not disqualify the witness to testify, as Section 5, Article II, of our Constitution provides that no person can be disqualified from testifying on account of his religious opinions. The contention is that this constitutional provision merely prohibits the witness from being disqualified as such but does not prevent the showing of his disbelief in God as going to his credibility, of which the jury is the judge. In other words, plaintiffs claim it was proper to show that the witness was an infidel, not to disqualify him as a witness, but for the sole purpose of affecting the credibility of his evidence, much as it is proper to show that the witness has been convicted of a crime, has a bad reputation for truth and veracity, etc., as bearing on his credibility. We think also that plaintiffs would concede that it would not be permissible, even for this purpose only, to prove that a witness belongs to a particular religious sect or cult, such as being a Catholic or a Protestant, or even a Mormon, Christian Scientist, etc., although such fact might discredit the witness in the minds of some jurors. A little to our surprise, this question seems to be somewhat new in this State. At common law such religious belief or rather lack of belief rendered the witness incompetent to testify and there are many cases on that subject. But the Constitution or laws of most, if not all, the American states, as in this State, has abolished religious tests as to the competency of witnesses. [Jones on Evidence (3 Ed.) 714.] But the question yet remains whether or not such want of religious belief as implied in the term "infidel" or "agnostic" may yet be shown as bearing on the question of the witness's credibility. In 40 Cyc. 2613, this is said: "In some jurisdictions it is held that the religious beliefs of a witness or his lack of any such belief may be gone into for the purpose of affecting his credibility; but in other jurisdictions this method of impeaching the testimony of a witness or of questioning his credibility is denied." Cases from five states, Indiana, Iowa, Massachusetts, New York, and Pennsylvania, are cited as sustaining this proposition and cases from seven states, California, Illinois, Kansas, Kentucky, Maine, New Hampshire, and Texas, are cited to the contrary. A reading of the cases there cited does not show as great a diversity of opinion as the quoted text indicates. At least in Iowa and Massachusetts it is held that it is not competent to question the witness himself as to his opinions in this respect, and that is the precise question here presented. In Searcy v. Miller (Iowa), 10 N. W. 912, 916, it was held that it was not competent to show that a witness "did not believe in a future state of rewards and punish-

ments," and further: "The questions under consideration were allowed to be asked of the witness on cross-examination. This was not proper. In 1 Greenleaf on Evidence, section 370, it is said: 'The state of his religious belief, at the time he is offered as a witness, is a fact to be ascertained. The ordinary mode of showing this is by evidence of his declarations, previously made to others, the person himself not being interrogated. The want of such religious belief must be established by other means than the examination of the witness upon the stand. He is not to be questioned as to his religious belief, nor required to divulge his opinion upon that subject, in answer to questions put to him while under examination.'" This same rule is applied in Massachusetts, Commonwealth v. Burke, 16 Gray, 33, where it is said that such was the rule at common law. It is said, however, in the late case of Allen v. Guarante (Mass.), 148 N. E. 461, that "The credibility of witnesses can be affected only by evidence of their disbelief in the existence of God." In People v. Copsey (Cal.), 12 Pac. 721, it is held that a witness cannot be impeached by showing him to be an atheist. In New York, Brink v. Stratton, 176 N. Y. 150, 63 L. R. A. 182, the court thoroughly considered this question and held (Syllabus): "A witness cannot be interrogated as to his belief in a Supreme Being who would punish him for false swearing, for the purpose of affecting his credibility, under constitutional provisions that no person shall be incompetent to be a witness on account of his religious belief, and abrogating all disqualification from civil rights on account of such beliefs." The same court had previously said in People v. Most, 128 N. Y. 108, 26 Am. St. Rep. 458, that "The exception to the question put to the witness on cross-examination as to his belief in a Supreme Being is frivolous." And in Virginia and Kentucky it is held that a witness cannot be interrogated as to his belief in a Deity for the purpose of affecting his credibility. [Perry v. Com., 3 Gratt. 632; Bush v. Com., 80 Ky. 244; Louisville & N. Railroad Co. v. Mayes (Ky.), 80 S. W. 1096. See, also, Starks v. Schlensky, 128 Ill. App. 1; Dickinson v. Beal, 10 Kan. App. 233, 62 Pac. 724; Free v. Buckingham, 59 N. H. 219.] Jones on Evidence (3 Ed.), section 713, says: "By the weight of authority in this country, a witness will not be compelled to submit to an examination for the purpose of showing his belief, or want of belief. It is held that to require such a disclosure would be foreign to the spirit of our institutions," citing Carter v. State, 63 Ala. 52, 35 Am. Rep. 4, and other cases.

Clearly the great weight of authority is that under constitutional provisions such as ours, the question of a witness's personal belief, even as to there being a God or Supreme Being, cannot be inquired into, specially of the witness himself, for the purpose of affecting his credibility. What exceptions there may be to this rule need not here be inquired into.

The case cited and relied on by plaintiffs in support of their con-

tention is that of State v. Rozell (Mo.), 225 S. W. 931, where it was held that, where a dying declaration of the deceased was admitted in evidence in a criminal case, it was competent and proper to show that such declarant was an infidel and disbeliever in God, as affecting the credibility of his dying statement. The admissibility in evidence of such dying statements rests on somewhat different principles than is the evidence of a living witness, in that the dying declaration is not under any oath to speak the truth and the witness is in no way subject to cross-examination. The fact of consciousness of impending death on the part of the declarant is taken as a substitute for or at least dispensing with the necessity of an oath; dispensing with the right of cross-examination and the right to meet the witness face to face when dying declarations are offered arises ex necessitate. The proof of the declarant's disbelief in God or a Deity must come from proof other than by cross-examination of the witness himself, and so that objection is not present. All the authorities cited in support of the ruling in State v. Rozell, supra, relate to dying declarations and the right to discredit a declarant in the manner stated. In Iowa, Searcy v. Miller, supra, it is pointed out that there is a distinction as to the matter under discussion between the declarant making a dying declaration introduced in evidence in a criminal case and in discrediting living witnesses by cross-examination. In any event, we decline to extend this method of impeachment to the cross-examination of a living witness. My view of the law in this respect is that since the jury is the sole judge of the credibility of the witness and the weight to be given to his testimony, the jury should be placed in possession of all the facts relating to the witness and his evidence which will enable it to properly estimate the degree of credit to be given to each witness, but that matters and facts which tend to merely or more likely prejudice and bias the jury should be excluded. No question should, therefore, be allowed and its answer compelled for the purpose of discrediting the witness unless the fact which the question seeks to elicit has an inherent or obvious tendency by general consensus of opinion among civilized people to make the witness, in the eyes of honest and right-thinking men, less likely to tell the truth. The mere nonbelief in God does not measure up to this standard.

The result reached by us is that the order granting plaintiffs a new trial should be and is reversed; that the case be remanded with directions to reinstate the verdict of the jury and enter a judgment thereon establishing the probated writing as the last will and testament of John W. McClellan, deceased. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.