Argued May 17; reversed June 27; rehearing denied
September 12, 1939

# STATE *v.* ESTABROOK

(91 P. (2d) 838)

In Banc.

Kneland C. Tanner, of Portland, for appellant.

G. Russell Morgan, of Hillsboro, and Ralph E. Moody, of Salem, for respondent.

BAILEY, J.  On March 17, 1938, the grand jury of Washington county returned an indictment against Jack Estabrook, Melvin Arthur Bozarth and Leon V. Wallingford, accusing them jointly "of the crime of use of explosives to damage the property of another, committed as follows: That the said defendants Melvin Arthur Bozarth, Jack Estabrook and Leon V. Wallingford on the 30th day of May, A. D. 1935, in the said

county of Washington, state of Oregon, then and there being did then and there purposely, maliciously and feloniously set off and explode a dynamite bomb with the intent then and there to injure the property of another, to wit: Wm. Fuegy, contrary to the statutes in such cases made and provided and against the peace and dignity of the state of Oregon." Bozarth and Wallingford pleaded guilty to the charge contained in the indictment. Estabrook was convicted and sentenced to serve 18 months in the penitentiary and to pay a fine of $500 and costs.

Prior to the trial resulting in the above judgment, from which this appeal is taken, Estabrook was twice tried on the charge set forth in the above indictment, in each of which former trials the jury was unable to agree upon a verdict and was discharged. Upon the third and last trial the jury returned a verdict against the defendant, in which 10 of the 12 jurors concurred.

It is the contention of the state that the explosion of the bomb in the instant case by the defendant and his two associates was a part of, and connected with, the strike and picketing activities then being conducted by a labor organization, Truck Drivers' Union, Local No. 162, of which they were members, against Northwest Brewing Company, which manufactured Marinoff beer in the state of Washington and distributed it from a warehouse in Portland, Oregon, throughout Oregon and parts of Washington. This brewing company will hereinafter be referred to as the Marinoff brewery. The strike started in the latter part of April, 1935, and was incidentally or directly caused by the placing of an embargo upon the delivery of beer from Oregon to Clark county, Washington.

The defendant, who was employed by the Marinoff brewery as a truck driver at the time the strike was called, immediately quit his work for that company and took a position in the picket line around the Marinoff warehouse in Portland. Bozarth and Wallingford, who were also truck drivers, were sent to assist in picketing the Marinoff warehouse. Bozarth became acquainted with Estabrook while picketing the Marinoff warehouse, while Wallingford had known him for some time, although not intimately.

Oscar Neiman, also a member of Local No. 162, was manager of the Marinoff plant at Stevenson, Washington. He had charge of the distribution of Marinoff beer in a number of counties in Washington adjacent to the Columbia river, including Clark county, in which Vancouver is located. On or about May 1, 1935, while the strike was in progress, he came to Portland with his truck to obtain Marinoff beer for his district. While at the warehouse in Portland he was told by Estabrook that he could not take beer to Vancouver. Neiman, however, loaded his truck and started for Vancouver, and when about 150 feet away from the brewery in Portland he heard a whistle and stopped his truck. Estabrook ran over to his truck, called him a foul name and told him that he would "never get to Vancouver alive". Estabrook snatched the ignition key out of the truck and after a hot argument gave it back to Neiman, again telling him that he would never get to Vancouver alive. Neiman and his assistant, a man named Ernest Pio, started for Vancouver and while the truck was on the Lovejoy ramp an automobile went ahead of it and crowded it over to the curb, causing it to stop. In this automobile were Bozarth and Wallingford. A free-for-all fist fight ensued and the truck was returned to the

Portland warehouse. Bozarth and Wallingford, according to their testimony, had been instructed by Estabrook to pursue the truck and if possible prevent it from proceeding to Vancouver.

The next day Neiman and his assistant, Pio, made a new start for Vancouver with a load of beer, guarded by two special officers, Stike and Wheeler, hired by the Marinoff brewery to escort them to Vancouver. While on Union avenue in Portland, the truck was again stopped by an automobile that forced it to the curb. After it stopped the defendant came alongside the truck and was going to pull Pio from the seat beside the driver. When the truck stopped, the two special officers came up and stood a short distance from it, about five feet apart. Thereupon, in the language of Neiman, Jack Schlaht, who was one of the men in the automobile that forced the truck to the curb, "hit one officer, he hit Stike; just then he hit Wheeler, and Stike landed with his head against the curb and Wheeler was out." About that time Estabrook came up, "put his foot over the top of his [Stike's] head," swore at him and said, "you draw for a gun, I will stamp your brains out." Bozarth and Wallingford do not appear to have been present during this encounter. The facts as to what then and there occurred were testified to by a number of witnesses who were in no wise accomplices of Estabrook in the crime with which he is herein charged.

After the strike was called against the Marinoff brewery, the trucks delivering Marinoff beer were followed by some of the men engaged in picketing the warehouse, who attempted to persuade the drivers not to deliver the beer. In addition, many retailers of that beer in Portland and vicinity were solicited by members of Local No. 162 not to handle Marinoff beer because

the company manufacturing it was on the union's "unfair" list.

P. P. Wright conducted a confectionery business at Twentieth and East Burnside streets in Portland and there sold Marinoff beer. He testified that he had been "warned by some of the drivers that he shouldn't handle this Marinoff beer, it was an unfair beer, but I continued on" until some time in the latter part of May, as he recalled, although the time was variously fixed by other witnesses as from early in May until the first part of June, when the front plate glass windows of his place of business were broken, about 11 o'clock at night, by men who drove up in an automobile and threw fire bricks through the windows. According to the testimony of Bozarth and Wallingford, on the night this was done Estabrook contacted them and induced them, together with another man, to accompany him in his car to commit this act of depredation.

Adolph Sagner, during the period of the strike, was conducting a confectionery and restaurant at Estacada, where he sold Marinoff beer. During the strike and prior to June 4 a number of drivers had warned him against handling this beer. Some four days before the window breaking now to be mentioned, he went to the Marinoff brewery, stated that he would better discontinue selling its beer, and paid his bill. When he left he was given a bottle of beer to take along with him. As he came outside the warehouse six or eight men told him to "take that beer and take it right back." This he refused to do. The men came up to his car and one of them said, "We have got your number; we'll fix you." Sagner went home, and during the next day another driver came to his place of business and advised him that he could not deliver Marinoff beer to him any

longer. The fourth night after Sagner was accosted by the men at the warehouse, he testified, he came home during the night and found the front windows broken at his place of business, and inside the building he picked up three "rocks", one of which "went clear through the big window and broke the show glass."

Bozarth and Wallingford, in testifying about this incident, did not agree on the date when the window breaking occurred. Bozarth placed it at about the first of May, while Wallingford said that it was after a union meeting on June 4. Both stated that it was Estabrook who suggested the trip to Estacada, and that they accompanied him there late at night, together with a fourth man, and broke the windows.

Mr. and Mrs. William Fuegy on May 30, 1935, at the time the bombing occurred, were conducting a general country store on Cornelius Pass road at the junction of that road and North Plains road in Washington county. The store building is located on the easterly side of Cornelius Pass road, and at the south of the store, some 70 feet distant, there is a building referred to as a garage or a blacksmith shop, owned by the Fuegys. The Fuegy residence is located on the westerly side of the Cornelius Pass road, across from the store. On the north side of the store, at the rear, there is a room in which either Mr. or Mrs. Fuegy sleeps while guarding the store at night.

The Fuegys sold a number of brands of beer in their store, including Marinoff. Prior to May 30, the defendant, while working as a truck driver for the Marinoff brewery, delivered Marinoff beer to the Fuegy store. Before that date also, efforts had been made to dissuade the Fuegys from continuing to sell this brand of beer. On May 29 Mr. Fuegy went to the warehouse of

the Marinoff brewery to get some beer and while there he noticed the defendant in the picket line. He encountered difficulty in getting beer out of the warehouse, went to another place to obtain beer, and returned home that evening. A little after midnight Mr. Fuegy locked the store and went to his residence. Mrs. Fuegy had already retired in the back room of the store.

Mr. Fuegy had just gone to bed when he heard a loud noise, as of an explosion. He also heard, but did not see, cars on the highway at that time. He did not then discover the source of the noise. The next morning, upon investigation he found that the ground between the store and the blacksmith shop was torn up and there was a furrow that he described as a hole about three feet around, with the earth removed to a depth, he estimated, of 18 inches.

According to the story of Bozarth and Wallingford, the defendant, sometime during the day of May 29, suggested that they set off a bomb on the Fuegy premises. The three men then proceeded to the Hemrich brewery, where they contacted LeRoy Cooper, who was a member of the same union as they and at that time was acting as shipping clerk for the Hemrich brewery. The defendant requested some powder of Cooper, which the latter procured from somewhere within the Hemrich plant, and with this powder Estabrook, Bozarth and Wallingford drove in Estabrook's car to Bozarth's home, where a bomb was constructed. When it was completed it was placed in the basement of the house and the three men went back to the picket line, where a discussion was had as to what car "that they had access to was capable of making this trip."

The car which Estabrook owned was a 1929 model A Ford, which, it was said, was incapable of exceeding a

speed of 50 miles an hour. Bozarth and Wallingford remained in the picket line while Estabrook went in search of a faster car. He returned late that night, and announced that he had located one. The three thereupon left the picket line in Estabrook's car, drove to a garage where they obtained a practically new Chrysler car, either a roadster or a coupe, belonging to Al Rosser. From that point they drove both cars to a garage which was owned by Bozarth's father and was in charge of Bozarth's younger brother, John. There Estabrook was introduced to John Bozarth, and asked permission to leave his car in the garage for some time. From the garage the three men drove in the Chrysler car to the Bozarth home, where they picked up the bomb, and then proceeded across the St. Johns bridge, through Linnton and up the Cornelius Pass road to within a short distance of the Fuegy store, where they stopped the car.

There was some discussion as to who would throw the bomb. Estabrook first suggested that he do it, but on Wallingford's insistence that Bozarth throw the bomb, Estabrook got into the seat beside the driver and Bozarth got into the rumble seat. As they drove by the Fuegy place Bozarth threw the bomb so that it fell in a vacant space between the store and the blacksmith shop. It struck the ground and exploded about 41 feet from the store, 29 feet from the blacksmith shop and 51 feet in from the east edge of the macadam part of the road. The three then drove back to Portland, got Estabrook's car and returned Rosser's car. According to John Bozarth, it was sometime after midnight when they returned and took out the Ford.

The first assignment of error questions the sufficiency of the indictment, in that it does not describe the

property which the accused is charged with intent to injure. The substance of the indictment has been set out at the beginning of this opinion. That part of it toward which the attack is directed sets forth that the defendant and his associates did "purposely, maliciously and feloniously set off and explode a dynamite bomb with intent then and there to injure the property of another, to wit: Wm. Fuegy." It is the contention of the defendant that the indictment should have stated whether it was real or personal property that was injured, and should have contained a sufficient description of the property so that it could be identified.

The statute upon which the state relies is § 14-358, Oregon Code 1930, reading as follows:

"If any person shall purposely and maliciously, and with intent to injure the person or property of another, set off or explode, or attempt to set off or explode, any bomb, dynamite, powder or other explosive, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than one year nor more than 20 years, or by imprisonment in the county jail not more than one year, or by fine of not more than $500, or by both such fine and imprisonment."

This section of the code was enacted as § 1 of chapter 408, Laws 1929, the title of which enactment is: "An act making it unlawful to injure any person or property of another with the use of any bomb, dynamite, powder or other explosive . . ." This title is sufficiently broad in its terms to cover the body of the act. The indictment in the instant case followed the language of the statute in charging the defendant with the commission of the crime of which he was accused, and this court has in many instances held such form of indictment to be

sufficiently definite: *State vs. Pearlman,* 154 Or. 52, 58 P. (2d) 1253, and cases therein cited. Moreover, the defendant had the right, had he chosen at the proper time and in the proper manner to exercise it, to require the state to supply any deficiency in the description of the property referred to in the indictment: *State v. Bruce,* 5 Or. 68, 20 Am. Rep. 734.

. Section 13-703, Oregon Code 1930, provides what the indictment must contain. Subdivision 2 of this section requires that the indictment contain a statement of the acts constituting the offense, in ordinary, concise language, in such manner as to enable a person of common understanding to know what is intended. Section 13-706, Oregon Code 1930, specifies that the indictment must be direct and certain as it regards: 1, the party charged; 2, the crime charged; and 3, the particular circumstances of the crime charged when they are necessary to constitute a complete crime.

■ The grounds on which the defendant may demur to the indictment are set forth in § 13-831, Oregon Code 1930, as follows: 1, that the grand jury by which it was found had no legal authority to inquire into the crime charged, etc.; 2, that it does not substantially conform to the requirements of chapter VII of title XIII of the code, of which §§ 13-703 and 13-706, *supra,* are a part; 3, that more than one crime is charged in the indictment; 4, that the facts stated do not constitute a crime; and 5, that the indictment contains any matter which, if true, would constitute a legal justification or excuse of the crime charged, or other legal bar to the action. By § 13-839, Oregon Code 1930, it is provided that when the objections mentioned in § 13-831, *supra,* appear on the face of the indictment they can be taken by demurrer only, "except that the objection to the jurisdiction

of the court over the subject of the indictment, or that the facts stated do not constitute a crime, may be taken at the trial, under the plea of not guilty and in arrest of judgment.'' The failure of the indictment to describe specifically the property which the accused is charged with intent to injure, if a defect, was one apparent on the face of the indictment, and inasmuch as the defendant did not demur to the indictment, he has waived the objection which he now urges: *State v. Bruce,* supra; *State v. Doty,* 5 Or. 491; *State v. Lee Wye,* 123 Or. 595, 263 P. 60.

After the first trial the defendant filed a motion for permission to withdraw his plea of not guilty and to file a demurrer to the indictment. Accompanying this motion was the demurrer which it was proposed to file if the motion should be granted. The grounds stated in the demurrer are the following: 1, that the indictment does not substantially conform to the requirements of chapter VII, title XIII, of the criminal code; 2, that the language used in the indictment is not such as to enable a person of common understanding to know whether the property which the accused intended to injure was realty or personalty; 3, that the crime charged is not stated with such degree of certainty as to enable the court to pronounce judgment; and 4, that the facts stated do not constitute a crime. The second and third grounds of the defendant's demurrer are for all practical purposes covered by the first specification stated, and all three were waived by failure to demur. The fourth ground, namely, that the facts stated do not constitute a crime, was not waived by failure to demur to the indictment: § 13-839, *supra.*

At the time the motion to withdraw the plea of not guilty was filed, the defendant undoubtedly was fully

advised by the evidence in the first trial as to the property which he was accused of intending to injure, and therefore was not prejudiced by the denial of his motion. There was no abuse of discretion on the part of the court in refusing to permit him to withdraw his plea of not guilty and file a demurrer.

■■ One of the grounds assigned by the defendant in his motion for a directd verdict was lack of any evidence of a specific intent to injure the physical property of William Fuegy at the time the dynamite was exploded. The question, however, is not whether the explosion of the bomb actually did any material damage to the property, but whether the defendant purposely and maliciously intended to injure Fuegy's property. It is argued by the defendant that it appears from the evidence that he and his coconspirators intended to intimidate the Fuegys and thereby discourage them from selling Marinoff beer. The facts indicate that although that might have been and undoubtedly was the ultimate purpose of the three men, they did, by exploding the bomb on Fuegy's property, actually injure it. The throwing of the bomb was done purposely and maliciously, and an injury was caused to the property. It is obvious that the injury might have been much more serious. The law presumes that a person intends the ordinary consequences of his voluntary act: § 9-807, Oregon Code 1930. There is, therefore, sufficient evidence in the record from which the jury might find that the defendant intended to injure Fuegy's property in the manner in which it was injured. The bomb was thrown purposely and maliciously. The enactment of § 14-358, *supra,* was for the purpose of deterring the very act that was done in the instant case.

The second ground of the motion for a directed verdict is that there is no ''competent corroborating evidence tending to connect the defendant with'' the commission of the crime. In discussing this feature of the case, it is deemed advisable to refer to a matter covered by other assignments of error, namely, evidence of other acts of vandalism in which Estabrook and his associates were engaged. The conclusion might well be drawn from the evidence that the acts of violence which have above been mentioned, and others of a similar nature, were committed in order to make more effective the strike against the Marinoff brewery. If deliveries could be prevented and retailers handling Marinoff beer could be persuaded to discontinue doing so, then the objects sought to be accomplished by the strike might more readily be gained. The defendant himself was active not only in picketing the Marinoff plant but in preventing deliveries of beer and in the instigation of damage to property of dealers selling Marinoff beer. Evidence of such acts was admissible as showing the motive of the defendant in the commission of the crime with which he is here charged, and as tending to prove a general, composite plan or scheme: *State v. Gillis,* 154 Or. 232, 59 P. (2d) 679; *State v. Justice,* 157 Or. 597, 71 P. (2d) 798.

Proof of the defendant's connection with those acts was not entirely limited to the testimony of accomplices such as Bozarth, Wallingford and Cooper. A number of other witnesses, unconnected with the present crime, testified concerning the defendant's activities relative to the Union avenue incident hereinabove related. There were also numerous witnesses other than accomplices who testified as to the defendant's activities around the Marinoff plant and in the picketing. John

Bozarth testified to the presence of the defendant and his associates together at night at the garage of which he was in charge, their departure therefrom in the Rosser car, and the removal of the defendant's car from the garage sometime after midnight. The defendant, however, denied that he was with either Bozarth or Wallingford on the night of May 29, 1935, and further denied that either he or his car was at the Bozarth garage that night.

Mrs. Fuegy testified that the defendant, accompanied by his attorney, called on her at the store a few months before the first trial, and asked for Mr. Fuegy. On being informed that he was in Portland, the attorney stated that, "Mr. Estabrook was—it seems to me that they were trying to pin something on him or something, and he didn't even know the boys, he never associated with them and didn't even know the boys." Asked who made that statement, Mrs. Fuegy answered that it was the attorney who did, and that the defendant "was right there and heard it." On cross-examination she testified as follows:

"Q. I want to know, Mrs. Fuegy, why you would say to this jury that I would tell you out there on that occasion anything about Mr. Estabrook's acquaintance with Bozarth and Wallingford. A. Well, you did.
     *     *     *     *     *

Q. Tell us all you can remember. A. You said something about Mr. Estabrook, if I remembered him, I said he looked familiar; and you mentioned that they were trying to pin something on him and that he didn't even know the boys and he never associated with them."

In our opinion, the testimony of the accomplices is amply corroborated by other evidence tending to connect the defendant with the commission of the crime

with which he is charged. In addition to proof of the defendant's active participation in the strike and the existence of the motive on his part in preventing the Fuegys' handling Marinoff beer, there was the testimony of John Bozarth that the defendant came to the garage under his control late in the night of May 29, an hour and a half or so before the crime was committed, and that the defendant placed his car in that garage and departed in a new and faster automobile in company with Bozarth and Wallingford. Another circumstance to be kept in mind is that the defendant's car remained in the garage and was removed therefrom shortly after the throwing of the bomb. Moreover, there is the denial of these facts by the defendant, coupled with the denial of his attorney to Mrs. Fuegy in the defendant's presence that the latter even knew Bozarth or Wallingford.

The sufficiency of corroborating evidence depends upon the particular facts of each case: 2 Wharton's Criminal Evidence, 11th Ed., page 1272, § 754. "It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test": Ibid., page 1272, § 753. "It is not necessary to show by independent proof a link between the accomplice's testimony and the corroborative proof; when the proof claimed to be corroborative tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy a jury that the accomplice is telling the truth, it is sufficient. For this purpose, if the accomplice is corroborated as to some material fact or facts, the jury may from that infer that he speaks the truth as to all": Ibid., page 1273, § 754. In *State v. Rathie*, 101 Or. 339, 356, 199 P. 169, 200 P. 790 it was said that, "the circumstances themselves are corroborative of the crime in the instant case. In the

first place, there was present a motive.'' The prior decisions of this court on the sufficiency of evidence to corroborate accomplice testimony are collated and reviewed in the recent case of *State v. Reynolds,* 160 Or. 445, 86 P. (2d) 413. As applying to certain features of the case at bar, we direct attention particularly to the following authorities therein referred to: *State v. Townsend,* 19 Or. 213, 23 P. 968; *State v. Brake,* 99 Or. 310, 195 P. 583; *State v. Tranchell,* 119 Or. 329, 249 P. 367. See, also, 16 C. J. 707, § 1445.

■ Another assignment of error is based on the refusal of the court to admit in evidence a certified copy of an indictment charging the defendant and two others with the crime of participating in a riot on May 2, 1935, together with a certified copy of the verdict of the jury, in which the defendant was found not guilty of the crime therein charged. The facts set forth in the indictment would indicate that the crime charged had reference to the incident hereinbefore mentioned as occurring on May 2, 1935, that is, the stopping of Neiman's truck on Union avenue and the assaulting of two special officers. It is argued by the defendant that the court erred in not admitting the certified copies of indictment and verdict, as they tended to disprove the evidence introduced by the state concerning the defendant's participation in holding up the truck in which Neiman was transporting Marinoff beer from Portland to Vancouver, Washington.

The crime therein charged, as already stated, was that of participating in an alleged riot. The acquittal of the defendant of that charge would not, in our opinion, in any way tend to disprove his presence on Union avenue at the time Neiman's truck was stopped or his active participation in attempting to prevent Neiman's

transporting beer to Vancouver. We do not understand that by the introduction of evidence concerning this incident the state was attempting to prove that the defendant was guilty of participating in a riot. The defendant refers to what actually occurred as a "simple assault committed on a strike breaker." No error was committed by the court in refusing to admit the proffered exhibit.

■■■■■ Among the instructions given by the court was the following:

"Now, ladies and gentlemen, you are called here as a part of the machinery of this court to find a fact, and that fact is whether or not the defendant has committed an offense against the law."

The bill of exceptions sets forth that the defendant "duly excepted to this instruction". What his exception was, the record does not indicate. The only argument in this connection advanced by the defendant is that contradictory instructions should not be given, and it is asserted that this instruction is contradictory of the instruction given by the court to the effect that the only crime for which the defendant was on trial was that charged in the indictment. Instructions must be considered as a whole, and when the entire charge in the instant case is so considered, these two parts of it do not appear to be contradictory.

■■ It is also urged that the court erred in denying the defendant's motion for a change of venue, which was filed prior to the third and last trial. The showing made by the state that the defendant could have a fair trial in Washington county outweighed that of the defendant to the contrary, and there was no abuse of dis-

cretion on the part of the trial court in denying the motion.

■ The assignment of error predicated on the refusal of the court to grant the defendant's motion for a new trial, based upon alleged misconduct of the district attorney, is likewise without merit. It is contended that the district attorney was guilty of misconduct when he introduced Mr. Ralph E. Moody as a special prosecutor who had "been appointed by the chief executive, the governor of the state, to assist in any of these kind of cases, and will act with me in the prosecution of this case." It is urged that the very presence of Mr. Moody "indicated a special need for conviction". A further objection is made to the argument of Mr. Moody in analyzing the diary of Jean Adams, a witness from The Dalles, Oregon. No objection was made to the argument, and we see nothing improper in the statements made by Mr. Moody concerning the entries in the diary or the manner of the district attorney's presenting Mr. Moody as his assistant.

The defendant assigns as error the ruling of the trial court permitting the district attorney to cross-examine Mrs. Hattie Harrison, a witness called by the defendant, with reference to the doctrines of the Christian Science Church, and touching her religious beliefs, for the purpose of affecting the weight of her testimony, contrary to § 6 of article I of the constitution of the state of Oregon, which is as follows:

"No person shall be rendered incompetent as a witness or juror in consequence of his opinions on matters of religion, nor be questioned in any court of justice touching his religious belief, to affect the weight of his testimony."

The defendant called a number of witnesses to testify as to his reputation as a peaceful, law-abiding citizen in the community in which he resided. On the cross-examination of one of them, Mrs. Daisy McCormick, the following occurred:

"Q. (Mr. Morgan) Now, you are not by chance a Christian Scientist, are you? A. No, sir.

"Mr. Tanner: Well I didn't get a chance to object to that; that is all right, she has answered. Is there anything wrong being a Christian Scientist? I didn't suppose it was competent to make an inquiry of that kind.

"Mr. Morgan: Well, withdraw it.

"Mr. Tanner: All right."

Mrs. Hattie Harrison on direct examination testified that the defendant bore a good reputation as a peaceful, law-abiding citizen in the community in which he resided. The entire cross-examination of this witness by Mr. Morgan, the district attorney, with the concluding questioning by defendant's attorney, is now set forth:

"Q. You are a housewife, I assume? A. Yes, sir.

"Q. Do you have any other vocation? A. Yes, sir. Q. What is it? A. Christian Science practitioner.

"Mr. Tanner: Well, now, I didn't get a chance—I should have objected—do you intend to pursue that any, Mr. Morgan?

"Mr. Morgan: Yes, I do.

"Mr. Tanner: Your Honor, I certainly object to this man inquiring into people's—I have heard a lot of things in my day, but I want to say this is the first time the district attorney has ever attempted to inquire of a witness concerning their religious tendencies.

"Mr. Moody: He didn't ask her that; he asked her what her occupation was.

"Mr. Tanner: All right, that is the thing, that belief is all right, so far as I am concerned, but if you are

going to make an inquiry and pursue that any further, Your Honor, I want it being shown that it is being done over my objection as being improper cross-examination and misconduct.

"Q. (By Mr. Morgan) Well, you mean you go from house to house or neighbor to neighbor?

"Mr. Tanner: Don't answer until the court rules on the objection.

"Q. (By Mr. Morgan, continuing) As a practitioner?

"Mr. Tanner: Objected to as immaterial and irrelevant.

"The Court: Objection overruled; you may have an exception.

"Mr. Tanner: Thank you, Your Honor. Did you hear the question?   A. I believe not.

"Q. (By Mr. Morgan) What I mean, do you practice Christian Science as a practitioner in your own home or do you go out?   A. I do both; I have an office in my home; I also make calls.

"Q. You have done that for some little time, have you?   A. Yes, sir.

"Q. Well now, Mrs. Harrison, I understand the practical, chief essential of the Christian Science doctrine is that there is no sin or evil in this world, is that true?

"Mr. Tanner: I want my objection shown, if it is an inquiry as to what the tenets of that organization is, is not within the scope of inquiry here, it is improper, it is misconduct, I assign it as such.

"The Court: You need not repeat that, Mr. Tanner, you can show your objection.

"Mr. Tanner: I want the record to show the ground of my objection.

"The Court: Objection overruled; you may have an exception.

"Mr. Tanner: At this time the defendant invokes the provisions of the due process clause of the United States constitution which provides that—and I invoke that clause at this time and object to the inquiry and insist that the state is now attempting to deprive the

defendant of his liberty without due process of law in violation of the constitution of the United States, the protection of which document the defendant now invokes.

"Q. (By Mr. Morgan) Will you please answer the question? A. It would be very difficult to answer that question by 'yes' or 'no', as it includes the tenets of the Christian Science church which would require a long explanation.

"Q. Well, that is one of the tenets of the belief, is it not? A. Not exactly as you stated it; no, sir.

"Q. Will you state it for us? A. I haven't committed it to memory; I realize that is not the correct wording.

"Q. Irrespective of the tenets of the church, you, as a practitioner, believe that there is no such thing as evil in this world? A. I could answer it this way, that we take it to be anything that is real is something that can not be changed, and that could be the answer to that question, because sin, disease and death can be changed, so, therefore, they are not a reality.

"Q. All right, let's put it that way: there is nothing real about sin or evil, is there? A. Not according to Webster's dictionary. Q. According to your practice of your belief? A. That is true.

"Q. You as a practitioner, see no ills, do you, see any evil, rather? A. Not as a reality.

"Q. You see no sin as a reality? A. Not as a reality.

"Q. It just isn't real at all? A. Not according to the dictionary definition. Q. That is the way you believe it? A. That is correct.

"Q. You don't see any sin in Mr. Estabrook? A. No, sir. Q. You don't see any evil in him? A. No, sir. Q. It doesn't exist, so far as you are concerned? A. Not as far as I am concerned.

"Q. Now, have you talked to any one in that vicinity about his reputation as a law-abiding citizen. A. Only my husband.

"Q. Is he a believer in the Christian Science faith? A. Yes, sir.

"Q. You have talked to no one else about it? A. No, sir.

"Mr. Morgan: That is all.

"Q. (By Mr. Tanner) What is Mr. Estabrook's religion, if you know? A. I believe, a Catholic.

"Mr. Tanner: That is all."

■ At common law, one who did not believe in the existence of a Supreme Being and consequently was under no apprehension of future punishment for his falsehood was incompetent to testify: *Goodall v. State*, 1 Or. 333, 80 Am. Dec. 396; *State v. Ah Lee*, 8 Or. 214; *Bush v. Commonwealth*, 80 Ky. 244, 3 Ky. L. R. 740; *McClellan v. Owens*, 335 Mo. 884, 74 S. W. (2d) 570, 95 A. L. R. 711. But the constitutions or laws of most of the American states, if not all, have abolished religious tests as to the competency of witnesses: *McClellan v. Owens*, supra. In many states the constitutional provisions or statutory enactments on this subject are substantially in the language of the first clause of § 6, article I, *supra*, to the effect that no person shall be rendered incompetent as a witness or juror in consequence of his opinions on matters of religion. It has been held in numerous instances that the effect of such inhibition goes only to the competency of the witness and does not prevent inquiry into his religious belief as touching his credibility: 95 A. L. R. 726. In some jurisdictions, although the constitution does not provide by express language that the witness may not be questioned concerning his religious beliefs, nevertheless the courts have held that such is the spirit of the fundamental law of the state: *Bush v. Commonwealth*, supra; *Louisville & N. R. Co. v. Mayes*, 26 Ky. L. R. 197, 80 S. W. 1096; *Starks v. Schlensky*, 128 Ill. App. 1. See also, *McClellan v. Owens*, supra.

As far as we have been able to ascertain, Arizona is the only other state that has a constitutional inhibition similar, in wording, at least, to the last clause of § 6, article I, *supra*. Even the constitution of Indiana which was adopted in 1851 (Vol. 1, Rev. Stat. Ind. 1852), to which the origin of many Oregon constitutional provisions is traced, requires merely that, "No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion": § 7, article I, Indiana constitution of 1851.

The constitution of Arizona, in § 12 of article 2 thereof, expressly provides that no person shall "be questioned touching his religious belief in any court of justice to affect the weight of his testimony." This quoted clause differs only in arrangement of the words from the parallel Oregon inhibition, and in all probability was derived from our § 6, *supra*.

The above-mentioned section of the Arizona constitution appears to have been cited only twice by the supreme court of that state. The first instance was in *Fernandez v. State,* 16 Ariz. 269, 144 P. 640, wherein the court stated: "Questions were asked to test the witness' belief in God or the Great Spirit." Without further comment except to quote part of § 12, *supra,* the court held that the "question should not have been put to the witness". The other instance was the recent case of *Tucker v. Reil,* 51 Ariz. 357, 77 P. (2d) 203, in which the judgment of the trial court was reversed because that court permitted the attorney for the plaintiff to ask witnesses for the defendant whether they were members of the Seventh Day Adventist Church. The supreme court of Arizona, after emphasizing that part

of § 12, article 2, of the Arizona constitution hereinabove quoted, said:

"This is a direct prohibition against questioning any witness as to his religious belief, for the purpose of affecting his credibility. The language is positive and explicit. The only possible reason which can be advanced that it is inapplicable to the present situation is that an inquiry as to one's membership in a particular church is not questioning him 'touching his religious belief.' We think such an argument untenable. The fact that a man belongs to a certain church is certainly presumptive evidence that he believes in the fundamental principles of that church. When, therefore, a witness is asked in regard to his membership in a particular church, he is, in effect, being questioned in regard to his religious belief. It was, therefore, erroneous for the court to permit plaintiff's counsel to question any of defendant's witnesses in regard to their religious affiliations. The only possible purpose of such a question would be to attack the credibility of such witnesses, and this the constitution expressly prohibits."

Section 6 of article I of the Oregon constitution appears to have been directly referred to by this court in only one instance, the case of *State v. Ah Lee*, supra. Therein it was held that this provision of the constitution had abrogated the common-law rule which rendered incompetent as a witness any person who did not believe in a Supreme Being. The court further said, "As the deceased, under our laws, would have been a competent witness to testify in a court of justice, it follows that his dying declarations were admissible." In the earlier case of *Goodall v. State*, supra, the ruling was that when the dying declarations of the deceased had been admitted in evidence at the instance of the state it was proper for counsel for the defendant to offer proof that "the deceased was a disbeliever in a

future state of rewards and punishments, for the purpose of discrediting his dying declarations." No reference was made to the section of our organic act now under discussion.

The admission of evidence concerning the religious beliefs of a decedent following the admission of his dying declarations in evidence is by some courts placed upon a different ground from that of the cross-examination of a witness as to his own religious beliefs: *McClellan v. Owens*, supra. Yet decisions as to the admissibility of evidence of a decedent's religious belief are of little importance here, inasmuch as they throw no light on the actual question now under consideration, which is the application of a direct and positive constitutional prohibition against the questioning of any witness as to his religious belief for the purpose of affecting his credibility.

So far as the records of this court indicate, no attempt has heretofore been made, in either a criminal or a civil action, to affect the weight of a witness's testimony by questions directed to his or her religious belief. This is perhaps due to the fact that the bench and bar have in the past assumed that the provision of our constitution hereinabove quoted means what it says.

The language quoted from the Arizona decision is particularly appropriate as applied to the question which we are now discussing. In the case at bar the Christian Science Church was not an interested party. It was in no wise involved in the criminal prosecution of the defendant. The tenets of that church and the religious beliefs of the witness were entirely foreign to the matter then before the court for determination.

504

■■ Three reasons are assigned by the respondent as justification of its cross-examination of Mrs. Harrison. These are: 1, that the witness was not "actually required over objection to testify at all concerning her religious belief"; 2, that the objections to the cross-examination were insufficient to raise the question now being discussed; and 3, that the matters inquired into did not constitute matters of religious belief within the meaning of § 6, article I, *supra*. We have quoted the entire cross-examination, and we believe that a reading of it leaves no doubt as to the defendant's objection to the impropriety of the questioning. The defendant's objection was first pointed out when Mrs. Daisy McCormick was questioned as to the possibility of her being a Christian Scientist. Again, when Mrs. Harrison was being cross-examined, counsel for defendant objected to the course of the questioning, on the ground that it was improper cross-examination and misconduct. It is said by the respondent, however, that the defendant did not continue objecting to the questions put to Mrs. Harrison. That contention is answered adversely to the respondent, and very ably, in *Tucker v. Reil*, supra, following the excerpt hereinabove quoted. It is the general rule that when an objection to a certain class of evidence is made and overruled, the objection need not be repeated to the same class of evidence subsequently received.

■ We are of the opinion that the questions asked were directed to matters touching Mrs. Harrison's religious belief, within the contemplation of § 6, article I, *supra*, and that she was required to answer the same over the objection of the defendant. The trial court therefore erred in permitting counsel for the respond-

ent, after Mrs. Harrison answered questions as to her occupation or vocation, to inquire into the tenets of the Christian Science Church and the particulars of Mrs. Harrison's religious belief. The purpose of this cross-examination was undoubtedly to affect the weight of her testimony. The fact that she was called as a character witness did not suspend the operative effect of § 6, article I, *supra.* The provisions of that section apply alike to all witnesses.

Counsel for the respondent invoke § 3 of article VII of the constitution of Oregon and ask that the judgment appealed from be affirmed regardless of any error that may have been committed by the trial court. That section, in our opinion, should not be applied when a plain, specific and mandatory provision of the constitution has been violated, as was § 6, article I, *supra,* in the case at bar.

We are unable to say that the defendant was not prejudiced by the cross-examination hereinabove quoted. Nor can we say that the jury would have rendered the verdict which it did return, had the religious belief or affiliation of the defendant's witness not been injected into the case. In two previous trials the jury had been unable to agree upon a verdict, and on the trial which resulted in the judgment appealed from the verdict was not unanimous.

One of the important questions before this court was whether there was sufficient evidence to warrant submitting the case to the jury, and therefore the facts which we have set forth in this opinion are those which are most favorable to the state's case. No attempt has been made to indicate even the substance of much of the testimony that was introduced by the defendant.

The judgment appealed from should be reversed and the cause remanded to the circuit court for further proceedings not inconsistent with this opinion. It is so ordered.

RAND, C. J., and ROSSMAN, KELLY, BEAN, and BELT, JJ., concur.