IN RE ESTATE OF GOLDIE TIPTON, DECEASED.
AGNES MUSE ET AL., APPELLANTS, V. B. W. STEWART ET AL.,
APPELLEES.
113 N. W. 2d 644

Filed March 16, 1962. No. 35099.

*McCown & Baumfalk,* for appellants.

*Clarence C. Kunc, George H. Miller,* and *Wilbert Sunderwirth,* for appellees.

*B. W. Stewart,* amicus curiae.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an appeal from a judgment probating a lost will. The pertinent facts disclosed by the record may be summarized as follows: On October 8, 1958, Goldie Tipton, hereinafter referred to as decedent, a resident of Gage County, executed a last will and testament in the law office of B. W. Stewart, in the presence of B. W. Stewart and his secretary. At the time of the execution of the will, an original copy of a postnuptial agreement between the decedent and her husband, Doctor A.

Ernest Tipton, hereinafter referred to as Doctor Tipton, was attached to it. These were placed in an envelope and given to the decedent, who stated that she was going to place the envelope in her safe-deposit box. Doctor Tipton, who was with her on that occasion, testifies that this was done.

Decedent died on May 7, 1960, in Gage County, Nebraska. Doctor Tipton, her seventh husband, survived her. His competency was very questionable but he was called by the proponents and permitted to testify herein. A guardian ad litem was appointed for him in the county court. In addition to her husband, decedent was survived by one nephew, Arthur G. Watson, hereinafter referred to as Watson, and two nieces.

The original will was never seen after it was placed in the safe-deposit box. B. W. Stewart, hereinafter referred to as Stewart, who was named as the executor, filed a petition for probate of a lost will and produced an unsigned copy of the will which was received in evidence.

Briefly, the will devised a farm in Missouri of approximately 205 acres to the tenant, Donald G. Williams, hereinafter referred to as Williams, who was a nephew of decedent's third husband. The rest of her property was devised and bequeathed to her executor in trust, with directions to pay Doctor Tipton $2,000 which he had advanced on the purchase of a Beatrice property, and then provided for the payment to him of $200 a month for life. After the death of Doctor Tipton, she provided for the payment of $4,000 to Williams; $5,000 to her own nephew, Watson; $1,000 to the Church of Christ at Beatrice, of which she was a member; $1,000 to her Eastern Star chapter; $1,000 each to a Masonic lodge in Kansas and one in Missouri; $500 to the Salvation Army for use in Beatrice; and $500 to the State Department of Public Welfare for the use of the needy in the Tuberculosis Hospital at Kearney. The residue of the estate was then devised and bequeathed to a Methodist church and a

Christian church at Beatrice. There is nothing in the record which would in any way suggest any connection or association of decedent with these two churches.

On the Monday following the death of decedent the previous Saturday, Stewart, Watson, Watson's wife, Williams, and Doctor Tipton went to the bank and examined the safe-deposit box but did not find the will, although they did find an original signed copy of the postnuptial agreement. There is no question but that Mrs. Tipton was the only one who had access to the safe-deposit box. They then went to the Tipton residence and examined the contents of a large trunk which was locked. Watson handed Stewart the keys and Doctor Tipton pointed out the one to use. No will was found in the trunk, but they did find another copy of the postnuptial agreement which Stewart testified to the best of his recollection was signed, but that he wouldn't say it was. Stewart testified that in the process of examining the trunk, he removed packages of letters, receipts, and reports, and that in the center of the trunk he picked up a package and uncovered a white cotton or outing flannel bag for jewelry, and that Mrs. Watson, who was looking over his shoulder, said: " 'Why, there is Goldie's jewelry bag and there is nothing in it.' " On two subsequent occasions, Stewart examined the trunk and did not find the jewelry. Subsequently, after an administrator was appointed, the administrator went through the trunk and found the jewelry in the bag fastened with safety pins. There were no jewels or pins in the bag when it was first seen.

Williams arrived in Beatrice the day of decedent's death. He testified that when he arrived Doctor Tipton had the keys and said to him, " 'All her papers are in that trunk and here is the key to it,' " but that they did not open the trunk. Watson arrived the next day, Sunday, and made arrangements for all of them, including Doctor Tipton, to stay at the Paddock Hotel. Stewart took his office copy of the will to the hotel,

and Watson read it to all of them except Doctor Tipton. After the will was read, Watson said, " 'Now, Doctor is in his room asleep. He is under sedation, and * * * I put him to bed. I know where his keys are. They are under his pillow. We can get those keys and go up to the house if we wish.' " However, this was not done. Both Watson and Williams knew that Doctor Tipton had the keys. There is nothing to indicate that anyone went back to the house until the next day.

After a hearing on the petition for probate in county court, probate of the lost will was refused and an appeal was perfected to the district court by Stewart and Williams. They were joined in the appeal by the Eastern Star chapter and the two Masonic lodges. Previous to the filing of the petition for probate, a petition had been filed by Watson for the appointment of an administrator, and Vernon R. Mulig was appointed as administrator. Stewart and Williams perfected an appeal to the district court from the granting of letters of administration. These appeals were consolidated for trial in the district court. The district court overruled the objections, admitted the will to probate, and disallowed and dismissed the petition for administration.

A next-door neighbor to the Tiptons, Mildred L. Guenther, testified on behalf of proponents. She told of an occasion in November 1958, when the decedent discussed a will. Her testimony is as follows: "Q Now at any time did Goldie Tipton discuss with you or make any statements with reference to her will as such? A Yes. One day she came over and she said she had hardly slept all night before because she had brought her will home the day before and wanted to study it, and she said she could hardly wait until she took it to the bank downtown the next day because she was so worried about having it at home. Q Did she by any chance state where she was going to take it downtown? A Well, I believe she said the bank. Q Did you see this instrument yourself? A No, I didn't." The rest of the

testimony deemed pertinent will be summarized here-inafter.

The issue in this case is whether or not the copy of the alleged will should be admitted to probate. There is no question it should be admitted if the proponents have adduced evidence which, as a whole, is clear, un-equivocal, and sufficient in and of itself to overcome the presumption of revocation of the will by the decedent.

The last time the will was seen, the day of its execu-tion, it was in the possession of the decedent. The law of Nebraska is well settled that, where a will is shown to have been made and left in the custody of the testator, if it cannot be found after his death, the presumption is that the testator destroyed it animo revocandi. Williams v. Miles, 68 Neb. 463, 94 N. W. 705, 110 Am. S. R. 431, 62 L. R. A. 383. The very fact that the will cannot be found is regarded as tending to show that the testator destroyed it animo revocandi. However, such presump-tion is not conclusive but may be overcome by proper and sufficient proof that the testator did not revoke the will. In re Estate of Ladman, 128 Neb. 483, 259 N. W. 50.

A will is, according to law, of an ambulatory char-acter. No person can have any rights in it until the testator is dead. The testator may change it at pleasure, and human experience has shown that wills are almost always destroyed secretly. Consequently, the evidence to overcome the presumption of revocation of a lost will must be clear, unequivocal, and convincing. This bur-den is on the proponents, and the determination of the sufficiency of the evidence to overcome the presumption is for the court in the first instance. In re Estate of Drake, 150 Neb. 568, 35 N. W. 2d 417.

Before considering the sufficiency of the evidence, we note that there has been an inference that Watson, who would benefit if the will was revoked, may have utilized an opportunity to destroy it. As we view the evidence, this is a wholly incorrect assumption. The most that can be said is that Watson had access to the key the

Sunday after decedent's death, and while it is remotely relevant, it is not sufficient to overcome the presumption that the destructive act was done by the testator. Ignoring the fact that there is no evidence to suggest the will was in the trunk, there is not one scintilla of evidence to suggest that Watson visited the house alone or that he used the key. We assume that the fact that Mrs. Watson recognized the jewelry bag belonging to the decedent is supposed to have some significance. We think the nature of the exclamation speaks for itself. It is not the kind one would expect from someone who, we assume the inference to be, may have seen it a few hours previously. In any event, we say that the evidence of an opportunity of a person having an adverse interest to destroy a will does not alone rebut the presumption of revocation.

We must then determine the quality of the evidence adduced to determine its sufficiency. The decedent was a dominant woman. She appeared to be fairly methodical in her methods. She took charge of the business for the family. The evidence is undisputed that the will was deposited in a safe-deposit box to which she alone had access. On the only occasion when there is evidence that the will may have been out of the safe-deposit box, decedent was nervous and disturbed until she returned it. To find against the presumption, we must determine that she removed the will from the safe-deposit box for some purpose and had it in her home at the time of her death.

To rebut the presumption of revocation, the proponents rely on declarations of the testator. We will analyze this testimony. Stewart delivered the will to the decedent on October 8, 1958. She said that she was going to put it in her safe-deposit box, and he never saw it again or visited with her about it.

Williams testified that the decedent told him in August or September of 1959 that she was leaving him the Missouri farm and some money by will. On another occa-

sion, she told him that if anything ever happened to her, he was to come to Beatrice and get her keys, and there would be instructions in her trunk as to what to do. He further stated that when he arrived at decedent's home after her death, Doctor Tipton pulled out the keys and said, " 'All her papers are in that trunk and here is the key to it,' " but that they did not open the trunk.

Guy Pheasant, treasurer of the Church of Christ, testified that during 1958 decedent told him she was going to make a will and leave some money to the church, and she wanted to know how to do so. At a later date, she told him that she had completed her will and fixed it the way she wished.

Mrs. Fannie Pringle, supervisor at the state home where the Tiptons had been employed, and a member of decedent's church, testified that decedent mentioned many times about having made a will, and that she had fixed up her affairs. The Pringles usually took the Tiptons to church, and the last time they did so, a few days before the decedent's death, she thought that perhaps the Tiptons had had a little difficulty, and decedent said: " 'Mrs. Pringle, no, I won't take him on a long trip; he wants to take a long trip and I don't just feel like making them and I don't want to do it. You know he is taken care of at my death and,' she says 'I think that is enough, don't you?' " Mrs. Pringle also testified that shortly after decedent had made funeral arrangements for herself and Doctor Tipton, which was on September 29, 1958, decedent told her that she was pleased with the way Williams managed her farm and that he was to get it at her death.

Edwin T. Pringle testified that within a few months of her death, decedent was pleased with the fact that she had provided for Doctor Tipton's financial status after she was dead.

Reverend George Williams, minister of the Church of Christ, testified: "Mrs. Tipton was a very strong woman; you might say she was a dominant woman, I

suspect would be a better description; she was very much concerned with Dr. Tipton; she looked after him; she felt that she was responsible for him * * *. I went up there one afternoon it seems to me, as I remember, about two months before she passed away, and Dr. Tipton wasn't well. He was upstairs and she was downstairs, and we talked for a few minutes, and she said that Dr. Tipton wasn't well and that she was concerned about him, and so she said she had made provision so, if anything happened to her, that he would be taken care of and he wouldn't want for anything." He further testified that the church had been attempting to purchase a lot adjoining the church and he visited with her about it and the fact that the owners would not sell to the church, and then said: "* * * and I had talked to Sister Tipton one afternoon about it; and she said at that time that she had made plans so that she would—Let me see just how she did put it; I want to say it right. She said she had made provision to leave the church some money; she didn't say how much; but she said, since those people didn't know her and know she was a member of the church, that she would endeavor to purchase that lot for the church."

Doctor Tipton, who was called by the proponents, testified as follows: "A I knew Mr. Stewart made the will. I was right there. Q Was Mr. Watson up at your home last Easter before your wife died? A He was. Q Did you hear Mr. Watson there in your home and your wife talking and did you visit together on that day? A We sure did. Q And on that occasion didn't Mr. Watson tell your wife he would take care of you if she died, that he would see you were taken care of? A And she said that and she wanted him. But at the Paddock Hotel on Saturday there, while he was eating the dinner, they had their individual talk which I didn't hear. I wasn't any more concerned than you are. But she did say in the last she says, 'I want you to take care of Ernest.' Q And didn't she tell him right when you were there too

that she was going to see you were well taken care of? A She did. Q And didn't you tell him in the same conversation she had made a will and you were well taken care of? A I knew all about that. She didn't have to tell me. Q And didn't she tell him in that conversation that she had made a will? A Yes. Q And that you were well taken care of in the will? A That is what it says."

This summarizes the testimony on declarations. Additionally, the testimony is generally directed to the fact that the decedent was concerned about the future of Doctor Tipton, who was apparently incompetent; that she was satisfied with and grateful to her tenant, Williams; and was interested in her church and regular in attendance.

The only evidence whatever that the will existed subsequent to the day of its execution is based upon the declarations of the testator; declarations that she had a will or that she had made provision for certain beneficiaries. No one ever saw the will, and no one had access to it other than the decedent. Declarations of a testator may be received in evidence to prove the existence of a will. However, it should be remembered that the declarations at best are merely narrative of a past event and suggestive of reasons for the action taken; that wills are ambulatory; and that ideas and intentions change. The following quotation from Clark v. Turner, 50 Neb. 290, 69 N. W. 843, 38 L. R. A. 433, found at page 302, is still pertinent: "As said by the supreme court of the United States in Lea v. Polk County Copper Co., 21 How., 493: 'Courts of justice lend a very unwilling ear to statements of what dead men have said.' Such evidence is always considered dangerous, and subject to the closest scrutiny."

Is the evidence sufficient to rebut the presumption of revocation? The trial court held that it was, and proponents suggest that the finding of the court has the effect of a verdict of a jury and will not be disturbed

unless clearly wrong. Dunbier v. Stanton, 170 Neb. 541, 103 N. W. 2d 797. Before there can ever be a jury question, the trial court must determine that evidence of sufficient quality to rebut the presumption has been adduced. Has that been done in the instant case? We determine that it has not. We do not mean to infer that the proof required must establish with absolute certainty that the will was not revoked, but we do say that a degree of proof is required which produces conviction in an unprejudiced mind.

To find for the proponents, it is necessary to indulge in several speculations, the most important of which are that the decedent kept her will at home, locked in the trunk, and that someone other than the decedent surreptitiously removed and destroyed it. The proponents' evidence does more to rebut the inference that the decedent had the will at home than to sustain it. There is not even a scintilla of evidence to infer a motive for removing the will from the safe-deposit box, unless it would be to change or revoke it. Decedent was a methodical person, and, the evidence would suggest, kept her valuable papers in her safe-deposit box. The inventory of her estate lists many bonds and certificates of deposit which were apparently kept in the safe-deposit box. In any event, the will was traced to her safe-deposit box, and the decedent was uneasy on the one occasion when it may have been temporarily removed. We can assume that if decedent had been fully satisfied with her will, it would have remained in the safe-deposit box. The very fact that it was not there, when she alone had access to the safe-deposit box, suggests revocation in the absence of some reason for its removal. If we are to permit indulgence in speculation, what might we conclude from the fact that just a few days before her death she asked Watson, her closest blood relative, to take care of Doctor Tipton? He was a minor beneficiary in her will compared to Williams, her third husband's nephew. Stewart testified that an

original copy of the postnuptial contract was attached to the will. An original copy of that contract was in the safe-deposit box. Stewart was not positive the one in the trunk was an original copy. Reverend Williams testified decedent was going to endeavor to purchase a lot the church wanted. Could her discussion with Reverend Williams have made her question the disposition of the residue of her estate which was left to two other Beatrice churches with whom she had no ties? We can only answer that the very purpose of the statute of wills is to eliminate the uncertainties inherent in reliance on parol evidence. Consequently, courts have always required the evidence to admit a lost will, last in the hands of the testator, to be direct, clear, and convincing. We find the evidence in this case to fall short of that criterion.

A brief amicus curiae was filed by Stewart, the executor, questioning his exclusion as an attorney in these proceedings after he had testified. We said in McCormick v. McCormick, 150 Neb. 192, 33 N. W. 2d 543: "It is against sound principles of professional ethics for one who knows that he is to be called as a witness in a case to accept the retainer as lawyer in that case. And where, after retainer, it is apparent to an attorney that his testimony will be material in behalf of his client, it is his duty to confer with his client and associate counsel at once and finally determine whether he will become a witness. If it is decided that he shall be a witness, he should immediately sever his connection with the litigation." We hold that this same principle applies even though the attorney is representing himself in a representative capacity, such as executor. The action of the trial court in refusing to permit the executor to represent himself as an attorney, where it was apparent that he would be a witness, was in all respects proper.

For the reasons given above, the judgment of the district court admitting the lost will to probate is reversed and the cause is remanded with directions to dismiss

the petition for probate of the will, as well as the appeal from the granting of letters of administration, and to certify the case back to the county court for the completion of the administration proceedings.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.