633 N.W.2d 892 (2001)
262 Neb. 493
In re ESTATE OF Helen R. MECELLO, also known as Helen R. Geringer, deceased.
Joseph R. Kitta, Appellee and Cross-Appellant,
v.
George R. Geringer, Appellant and Cross-Appellee.
No. S-00-141.
Supreme Court of Nebraska.
September 7, 2001.
*895 Francis R. Pane and, on brief, Lisa M. Meyer, Omaha, of Gaines, Pansing & Hogan, for appellant.
William Stillmock, Omaha, for appellee.
HENDRY, C.J., and WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, Justice.

NATURE OF CASE
This is an appeal from the Douglas County Court, which denied the admission to probate of two wills allegedly executed by Helen R. Mecello (Mecello). The proponent of the 1996 will, Joseph R. Kitta (Kitta), offered an initialed copy of the will because the original could not be found. The proponent of the 1991 will, George R. Geringer (Geringer), offered a signed original.
The trial court found that both wills were duly executed and that the 1996 will revoked the 1991 will. However, the trial court also found that because the original 1996 will could not be located, it was presumed that Mecello had destroyed the instrument animo revocandi. Geringer has appealed, and Kitta has cross-appealed. We moved this matter to our docket pursuant to our statutory authority to regulate the caseloads of this court and the Nebraska Court of Appeals.

SCOPE OF REVIEW
An appellate court reviews probate cases for error appearing on the record made in the county court. In re Estate of Jakopovic, 261 Neb. 248, 622 N.W.2d 651 (2001).
When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Id.

FACTS
Mecello died on January 5, 1999. Geringer, Mecello's stepson, filed an "Application for Appointment of Special Administrator in Informal Proceedings" on January 6. On January 8, an "Amended Appointment of Special Administrator" was entered by the trial court, indicating that appointment was necessary to, inter alia, obtain access to Mecello's safe-deposit box. On February 4, Geringer filed an "Application for Informal Adjudication of Intestacy ... and Appointment of Personal Representative."
On February 19, 1999, attorney David Kolenda filed an affidavit with the trial court stating that he had prepared a will for Mecello and that she had executed said will on June 18, 1996 (the 1996 will). Attached to the affidavit was a copy of the 1996 will, which copy Mecello had allegedly initialed rather than signed.
On April 2, 1999, Kitta filed a petition for formal probate of the 1996 will and appointment of a personal representative. On April 5, 1999, Geringer petitioned for formal probate of a will dated June 25, 1991 (the 1991 will), and appointment of a personal representative. The actions were consolidated on the motion of the parties.
At trial, Geringer and his wife, Patricia Geringer, testified that some time in late February or early March 1999, they and their daughter went through Mecello's house and discovered a safe. Inside the safe, they discovered the 1991 will with a note allegedly stapled to it, which note *896 Geringer tore off. The note read: "Ron[,] This is my will (dated June 25, 1991). All others are Revoked! [signed] Helen R Mecello May 9, 1998 Mom."
In summary, the 1991 will devised $10,000 each to Geringer, Kerri Sibert, Scott Geringer, and Christopher Geringer; $5,000 to Brandon Sibert; $1,000 to St. Gerald's Catholic Church; and the remainder to Samuel Mecello, Mecello's husband, if living, otherwise to the cash devisees in proportion to their cash devises. The 1991 will revoked all previous wills and codicils.
The 1996 will devised $25,000 to Kathryn Kitta; $20,000 to Louis Mecello; $15,000 to the American Red Cross; $10,000 each to Kitta, Edward Kitta, Catholic Relief Services, the Salvation Army, and the Child Saving Institute; $5,000 each to Mary Kitta Scheebuger, Rick Sibert, Mary Kitta, Food for the Poor, Inc., the Visiting Nurse Association of Omaha, Nebraska, and the Salesian Society of St. John Bosco; $3,000 each to Richard Kitta, Thomas Kitta, Michael Kitta, Albert Kitta, Carol Kitta Gray, Debbie Kitta Wieczorak, Lori Kitta Long, Nicholas Sibert, and Brandon Sibert; $2,500 each to Emily Ryan and Mary Ridge; $2,000 to Marinell Garnatz; a certificate of deposit to St. Gerald's Catholic Church; and a certificate of deposit to Trinity Broadcasting Network. The will directed the personal representative to sell Mecello's house and give $10,000 to Christopher Geringer, with the remaining proceeds to go to Geringer. The will bequeathed Mecello's automobile to Daryl Greger. The residue of Mecello's estate was to go to St. John's Cemetery. The will revoked all previous wills and codicils.
At trial, Kolenda testified that he met with Mecello at his office on June 18, 1996. After they discussed and reviewed the will and determined that it met with Mecello's approval, Kolenda arranged for another witness to be present for the signing. He testified that Mecello signed the will in the presence of himself, the other witness, and his secretary, who would have notarized their signatures. Although Kolenda did not recall the name of the second witness, he stated that there were definitely two witnesses and that his secretary notarized their signatures. A copy of the will that was executed on that date was initialed by Mecello. This copy, marked as exhibit 7, was eventually sent to the First National Bank of Omaha (First National Bank). Kolenda stated that he would have asked Mecello whether this was her last will and testament and would have also asked her whether she was executing this will as a free and voluntary act for the purposes expressed therein.
Kolenda stated that it was his opinion that Mecello was of sound mind and that she knew the extent "of her family and her relatives and the natural objects of her bounty." As a subscribing witness, he watched Mecello sign the document and execute it as her last will and testament in the presence of the other witness. In addition, Kolenda testified that a self-proving affidavit was also executed by himself, Mecello, and the other witness in the presence of his secretary, who then notarized the self-proving affidavit along with the will.
The affidavit provided:
1. That the Testatrix declared, published and signed such instrument as her Will in the presence of each of [the witnesses] and that [the Testatrix] declared, published, and signed each instrument willingly, or directed another to sign for her, and that the Testatrix executed such instrument as her free and voluntary act for the purposes therein expressed.
2. That each of us, witnesses, signed the Will as a witness in the presence and *897 hearing of the Testatrix and at her request.
3. That each of us, witnesses, signed the Will as a witness in the presence of each other.
4. That to the best knowledge of each of us, at all times during the activities stated above:
(a) The Testatrix was 18 years old or more, or was not a minor;
(b) The Testatrix was of sound mind; and
(c) The Testatrix was under no constraint or undue influence.
After the will and self-proving affidavit were executed, Kolenda called Thomas Gaughen, a trust officer at First National Bank, and told him that a copy of the will would be sent to him because the bank was named as personal representative. Gaughen told Kolenda that a copy of the will initialed by Mecello would suffice. Kolenda stated that this was the reason that Mecello's initials were on the copy of the will that was sent to First National Bank.
Gaughen testified that he received "an unexecuted copy" of the 1996 will. Several other witnesses testified to conversations they had had with Mecello regarding this will and her intentions concerning the disposition of her property. A more detailed discussion of these facts will be set forth in the analysis section of this opinion.
Janet L. Huff, a safe-deposit clerk at the Norwest Bank in Ralston, testified that Mecello maintained a safe-deposit box there. Geringer contacted Huff prior to January 8, 1999, with regard to accessing the box. Since Mecello was the only signator for the box, Huff told Geringer that she would need a "court paper" granting him access. When Huff refused to let Geringer enter the box, Geringer replied that he was Mecello's son. Huff still refused to allow Geringer into the box because his name was not on the "access card."
On January 8, 1999, Geringer and his wife returned to the Norwest Bank with a "Letter of Special Administrator" allowing him access to the safe-deposit box. Huff testified that the Geringers were alone when they opened and examined the box in a privacy room. When the Geringers returned the box to Huff, it was empty. Geringer then surrendered the key and signed a contract closing the box.
Geringer testified that following Mecello's death, as special administrator of her estate, he entered her home and found the 1991 will and the attached handwritten note described above. Patricia Geringer testified that she also found a 1985 will in a stack of papers next to a shredder on Mecello's desk. On the front page of the will, a handwritten note across the text of the will states: "This Will is Void[.][T]here is a New one Made[.] Febr 141998 [signed] Helen R Geringer Mecello." Patricia Geringer testified that the 1985 will, marked as exhibit 15, was in the same condition as when she found it. Geringer offered exhibit 15 into evidence. Kitta's objection on the basis of insufficient foundation was sustained.
The trial court found that Mecello executed a will on June 25, 1991; that Geringer, the proponent of the 1991 will, had met the burden of establishing testamentary capacity and venue; and that the 1991 will was duly executed. The trial court also found that Mecello executed a will on June 18, 1996, in the law offices of Kolenda; that the execution of the 1996 will was attested to by Kolenda and another witness who could not be identified; and that the will was notarized by the secretary in Kolenda's office. The trial court concluded that on June 18, 1996, Mecello was of sound mind and voluntarily executed the original and an initialed copy of the 1996 *898 will. The trial court found that upon execution of the 1996 will, the original was left in the possession of Mecello and a copy bearing her initials was sent to First National Bank. The original of the 1996 will could not be found.
The trial court concluded that Kitta, the proponent of the 1996 will, had not met his burden to provide sufficient evidence to overcome the presumption that the lost will was destroyed by Mecello animo revocandi. Therefore, the trial court denied probate of the 1996 will. However, the trial court received the 1996 will as evidence that the 1991 will was revoked by Mecello and concluded that there was not sufficient evidence to establish Mecello's intent to revive the 1991 will.
For these reasons, the trial court denied probate of both the 1991 will and the 1996 will. Geringer, the proponent of the 1991 will, appealed, and Kitta, the proponent of the 1996 will, cross-appealed.

ASSIGNMENTS OF ERROR
Geringer assigns as error the trial court's findings that the 1996 will was duly executed, that the 1996 will revoked the 1991 will, and that a note allegedly attached to the 1991 will did not revive the 1991 will. The trial court also allegedly erred by failing to admit the voided 1985 will into evidence.
Kitta's cross-appeal assigns as error the trial court's finding that the 1996 will was destroyed animo revocandi.

ANALYSIS
An appellate court reviews probate cases for error appearing on the record made in the county court. In re Estate of Jakopovic, 261 Neb. 248, 622 N.W.2d 651 (2001). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Id. An appellate court, in reviewing a probate court judgment for errors appearing on the record, will not substitute its factual findings for those of the probate court where competent evidence supports those findings. See Big John's Billiards v. Balka, 260 Neb. 702, 619 N.W.2d 444 (2000).
Geringer argues that the trial court erred in finding that the 1996 will was duly executed. The statutory requirements for execution of a will are set forth in Neb. Rev.Stat. § 30-2327 (Reissue 1995):
Except as [otherwise] provided ... every will is required to be in writing signed by the testator or in the testator's name by some other individual in the testator's presence and by his direction, and is required to be signed by at least two individuals each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will.
Statutory provisions regarding the manner in which wills must be executed are mandatory and subject to strict construction. See In re Estate of Kaiser, 150 Neb. 295, 34 N.W.2d 366 (1948).
We first consider whether the trial court's finding that the 1996 will was duly executed is supported by competent evidence. The attestation required of witnesses to a will consists of their seeing that those things exist and are done which the law requires to exist or to be done in order to make the instrument, in law, the will of the testator. Id. "Due execution means compliance with the formalities required by the statute in order to make the instrument the will of the testatrix." In re Estate of Flider, 213 Neb. 153, 155, 328 N.W.2d 197, 199 (1982).
*899 Neb.Rev.Stat. § 30-2430 (Reissue 1995) provides:
(a) If evidence concerning execution of an attested will which is not self-proved is necessary in contested cases, the testimony of at least one of the attesting witnesses, if within the state competent and able to testify, is required. Due execution of an attested or unattested will may be proved by other evidence.
(b) If the will is self-proved, compliance with signature requirements for execution is conclusively presumed and other requirements of execution are presumed subject to rebuttal without the testimony of any witness upon filing the will and the acknowledgment and affidavits annexed or attached thereto, unless there is proof of fraud or forgery affecting the acknowledgment or affidavit.
In contested cases, the proponents of a will have the burden of establishing prima facie proof of due execution, death, testamentary capacity, and venue. See Neb. Rev.Stat. § 30-2431 (Reissue 1995). We point out that in the case at bar, death and venue are not contested nor at issue. "Contestants of a will have the burden of establishing undue influence, fraud, duress, mistake or revocation. Parties have the ultimate burden of persuasion as to matters with respect to which they have the initial burden of proof." Id. In this case, the original of the 1996 will cannot be found.
Geringer claims that Kitta, the proponent of the 1996 will, did not produce sufficient evidence to meet the standard that the will constituted a valid testamentary document. In discussing the requirements of proving a lost will, we noted in Williams v. Miles, 68 Neb. 463, 478, 94 N.W. 705, 711 (1903) (quoting Clark v. Turner, 50 Neb. 290, 69 N.W. 843 (1897)), that "`while it is firmly established that a lost will may be proved by secondary evidence, the courts have always required such evidence to be direct, clear and convincing....'" Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. Records v. Christensen, 246 Neb. 912, 524 N.W.2d 757 (1994). Proof by clear and convincing evidence is still the requirement. See In re Estate of Thompson, 214 Neb. 899, 336 N.W.2d 590 (1983) (reaffirming requirement that proof of lost will be by clear and convincing evidence).
First, it is incumbent upon the proponent of a lost will to explain why the original will is not being offered for probate. See, Hober v. McArdle, 173 Neb. 510, 113 N.W.2d 625 (1962); In re Estate of Francis, 94 Neb. 742, 144 N.W. 789 (1913). Here, Kolenda, Mecello's attorney, testified to the circumstances surrounding the preparation and execution of the 1996 will and that an initialed copy was sent to the First National Bank, which was the personal representative named in the will. There was evidence that the 1996 will was placed in Mecello's safe-deposit box at the Norwest Bank and that 5 days before her death, Mecello told a friend that her will was in the box at the bank. The trial court found that upon execution of the 1996 will, the original was left in the possession of Mecello but that the original could not be found. We conclude that the proponent of the 1996 will has satisfactorily explained why a copy of the 1996 will was offered for probate.
Geringer suggests that because the statutorily mandated requirements for due execution are missing from the copy of the 1996 will, its proponent should have been required to introduce more substantiating evidence. We disagree. A lost will may be proved by secondary evidence which is *900 clear and convincing. In Williams, we expressly recognized that secondary evidence may be used to prove due execution of a will lost during the lifetime of the testator. The requirement is that such evidence be direct, clear, and convincing. "Due execution of an attested or unattested will may be proved by other evidence." § 30-2430(a).
Kolenda testified that after he discussed the will with Mecello and it met with her approval, he arranged for another witness to be present for the signing. Mecello then signed the will in the presence of Kolenda, the other witness, and Kolenda's secretary, who notarized their signatures. Kolenda asked Mecello whether this was her last will and testament and whether she was executing this will as a free and voluntary act for the purposes expressed therein.
Geringer claims that because attorney Kolenda could not recall the name of the second witness, the evidence was insufficient to support the trial court's finding that the will had been fully executed. Geringer's reliance upon In re Estate of Thompson is misplaced. There, we cited Matter of Estate of Weidner, 192 Mont. 421, 628 P.2d 285 (1981), stating:
[W]here it could not be established that there was a second individual who had witnessed either the signing [of the document] or the testator's acknowledgment of her signature, there was insufficient evidence to support a finding that the will was fully executed and thus it could not revoke a prior will.
In re Estate of Thompson, 214 Neb. at 903, 336 N.W.2d at 592-93. In that case, due execution of the will could not be established because it was not proved that there was in fact a second individual who had witnessed either the signing or the testator's acknowledgment of her signature.
Here, it was the identity of the second witness that could not be established, not whether there was in fact a second witness to the will. The evidence clearly and convincingly established that the will was executed by Mecello in a manner consistent with Neb.Rev.Stat. § 30-2329 (Reissue 1995). We conclude that the signature requirements have been proved by clear and convincing evidence.
The proponent of the 1996 will also has the burden of establishing prima facie proof of testamentary capacity. See, § 30-2431; In re Estate of Camin, 212 Neb. 490, 323 N.W.2d 827 (1982). As noted in In re Estate of Camin, § 30-2431 does not describe the manner by which such prima facie proof must be presented. Prior to the adoption of 1974 Neb. Laws, L.B. 354, this court stated in In re Estate of Coons, 154 Neb. 690, 48 N.W.2d 778 (1951), that all available witnesses must testify in a contested case. Otherwise, a prima facie case is not made. With the passage of L.B. 354, the only statutory requirement for the testimony of an attesting witness is found in § 30-2430(a), which requires "the testimony of at least one of the attesting witnesses."
The proponent of the 1996 will successfully established prima facie proof of Mecello's testamentary capacity with the testimony of Kolenda, an attesting witness and the attorney who prepared the will. Kolenda testified that Mecello was of sound mind, that she knew the extent of her family and relatives and the natural objects of her bounty, and that she executed the will as a free and voluntary act for the purposes expressed in the will. There was no evidence offered to rebut the proof of Mecello's testamentary capacity.
We conclude that the trial court's findings that the 1996 will was duly executed and that Mecello had the requisite testamentary capacity were supported by clear, *901 convincing, and competent evidence and are neither arbitrary, capricious, nor unreasonable. Therefore, Geringer's assignment of error is without merit.
We next address Kitta's cross-appeal that the trial court erred in concluding that Mecello had destroyed the 1996 will animo revocandi. The trial court found that upon execution of the 1996 will, the original of the will was left in her possession. Relying upon our decision in Muse v. Stewart, 173 Neb. 520, 113 N.W.2d 644 (1962), the trial court concluded that because the 1996 will could not be found, it was presumed that Mecello had destroyed the 1996 will animo revocandi. The trial court found that Kitta, the proponent of the 1996 will, had not met his burden of providing sufficient evidence to overcome this presumption. Kitta argues that the presumption of revocation was overcome by evidence of sufficient quality.
Whether the trial court should have applied the doctrine of animo revocandi is a question of law. On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. Riggs v. Riggs, 261 Neb. 344, 622 N.W.2d 861 (2001).
In Muse, we discussed the doctrine of animo revocandi. We stated that the law of Nebraska is well settled that where a will is shown to have been made and left in the custody of the testator, if it cannot be found after his or her death, the presumption is that the testator destroyed it animo revocandi, citing Williams v. Miles, 68 Neb. 463, 94 N.W. 705 (1903). "The very fact that the will cannot be found is regarded as tending to show that the testator destroyed it animo revocandi." Muse, 173 Neb. at 525, 113 N.W.2d at 647. The presumption of revocation is not conclusive, but may be overcome by proof that is clear, unequivocal, and convincing that the testator did not revoke the will. See id.
In Williams, we stated that
[t]he presumption of destruction animo revocandi is one of fact only. It governs in the absence of circumstances tending to a different conclusion, but may be overcome by circumstantial or other evidence to the contrary.... And declarations of the testator subsequent to the execution of the will, are admissible for this purpose.
(Citations omitted.) 68 Neb. at 468, 94 N.W. at 707.
If the will is traced out of the testator's custody ... the burden is on him who asserts a revocation to show that it came once more under the testator's control, or was destroyed by his direction.... In such cases if the person into whose hands the will is traced had an interest in procuring its destruction, some courts have suggested that they would go very far in presumptions as to the contents of the lost will and the mode of its disappearance.
Id. at 467, 94 N.W. at 707.
The doctrine of animo revocandi is applied when a will is last known to be in the custody of the testator and cannot be found after the testator's death. The logic is that since the testator was the last person to have custody of the will and it cannot be found, it is presumed that the testator destroyed the will. After the death of the testator, if custody of the will is shown to be in the possession of another, the doctrine of animo revocandi does not apply.
Here, the question is whether the proponent of the 1991 will is entitled to the presumption that the 1996 will was revoked. The declarations of Mecello after the execution of the 1996 will were admissible *902 to show that she did not revoke it. See id. Five days before her death, Mecello told Mary Kitta that her will was in her safe-deposit box at the bank. After Mecello's death, Geringer entered the box and emptied its contents. Thus, the facts show that a person other than Mecello who would benefit from the revocation of the 1996 will had access to the box which Mecello had stated contained her will. Therefore, under the facts of this case, Geringer is not entitled to the presumption that Mecello revoked the will, and we decline to apply the doctrine of animo revocandi.
Geringer failed to show that Mecello entered her safe-deposit box after her conversation with Mary Kitta or that anyone else had access to the box before Geringer took possession of its contents. The access card at the bank would have shown the date if Mecello had entered the box or if any other person had accessed it. The safe-deposit clerk testified that records were kept concerning Mecello's entry into the box, as well as anyone else's access to it. The access card was not offered in evidence.
Thus, Geringer, the proponent of the 1991 will, failed to establish by any evidence that the 1996 will was last in the possession of Mecello or was revoked by her direction. Geringer was not entitled to the presumption of revocation. The doctrine of animo revocandi should not have been applied in this case, and the trial court erred in applying the doctrine.
Muse v. Stewart, 173 Neb. 520, 113 N.W.2d 644 (1962), the case relied upon by the trial court, is readily distinguishable on the facts. There, we applied the doctrine of animo revocandi because there was no evidence that the lost will had been in the possession of anyone other than the testatrix. The testatrix stated that she was going to place the will and a postnuptial agreement in her safe-deposit box. The original will was never seen after it was placed in the box, and the evidence was undisputed that the will was deposited in a box to which the testatrix alone had access. After her death, several persons went to the bank and examined the box. They found the postnuptial agreement but did not find the will. Although there was an inference that one of the persons who would benefit if the will was revoked might have utilized an opportunity to destroy it, there was no evidence that this had occurred. We stated that there was not a scintilla of evidence to infer a motive for removing the will from the box unless it would have been to change or revoke it.
In contrast, the evidence clearly and convincingly established that Mecello did not revoke her will and that her will was in the safe-deposit box 5 days before her death. When Geringer first attempted to gain access to the box, he was refused entry because Mecello was the only signator for the box. Thereafter, Geringer returned with letters of administration and he was allowed access to the box. Geringer then removed everything from the box, returned an empty box to the bank, surrendered the key, and signed a contract closing the box. No inventory was made of the contents, and no disinterested witness testified as to the contents of the box.
Daryl Greger, a neighbor and friend, testified that he had had several discussions with Mecello about the disposition of her estate and matters relating to her will. Mecello told Greger that she kept her will in a safe-deposit box.
Mary Kitta, a very close friend of Mecello's and a former sister-in-law, testified that about 5 days before her death, Mecello called and was upset because Mecello's brother was ill and not expected to live and she did not want to be "the last one." *903 Mecello said that her brother was all she really had and that "`Ronny don't ever call. He don't come around.'" Mecello told Mary Kitta that Geringer would be "a very surprised young man because her Will all signed is in the safe deposit box, and the bank is going to handle it."
Mary Ridge, Mecello's neighbor, testified that in October or November 1998, Mecello told her that Geringer would be very surprised that he was going to get the house but that he and his wife could not live in it. They would have to sell it. Mecello told Ridge that she did not register her will at the courthouse because she was afraid Patricia Geringer would get in and read it at the courthouse. Mecello said that she kept her will in a safe-deposit box at the Norwest Bank.
Beverly Callahan, a friend of Mecello's, testified that after Samuel Mecello died, Mecello stated: "`I suppose the kid will get everything now.'" Callahan responded: "`What do you mean?' ... `He don't get it unless you say so, but you have to get a good lawyer and specify everything and make sure it was signed and put it in a safe place.'" According to Callahan, Mecello then stated: "`Safe place, I got. I got a safe deposit box.'" Later, Mecello told Callahan she was glad they had had that discussion because she thought everything automatically went to her stepson. Callahan responded: "`No, you can give it to whoever you wantcharities, or whatever. Youas long as you leave him something.' ... `You got to leave him something.'" Mecello thanked Callahan for telling her this and said that she had put her will in her safe-deposit box.
All reasonable inferences clearly establish that the 1996 will was not last in the possession of Mecello. If a will is traced out of the testator's custody, the burden is on him who asserts a revocation to show that it came once more under the testator's control or was destroyed by his or her direction. Williams v. Miles, 68 Neb. 463, 94 N.W. 705 (1903). There was no evidence that Mecello had entered the safe-deposit box after her conversation with Mary Kitta just 5 days before her death. The evidence was undisputed that Geringer, the proponent of the 1991 will, entered the box after Mecello's death. The burden was on Geringer to show the 1996 will was revoked by Mecello.

CONCLUSION
The contestants of a will have the burden of establishing undue influence, fraud, duress, mistake, or revocation. See § 30-2431. The proponent of the 1991 will, Geringer, has not established revocation of the 1996 will. Thus, we conclude that the trial court erred in failing to admit the 1996 will, which was duly executed, to probate. Having so concluded, it is unnecessary for us to address Geringer's other assignments of error.
For the reasons set forth herein, we reverse the judgment of the trial court and remand the cause with directions to admit the 1996 will to probate.
REVERSED AND REMANDED WITH DIRECTIONS.
CONNOLLY, Justice, concurring.
I disagree with the majority's determination that the presumption that Mecello destroyed the 1996 will with the intention to revoke it (animo revocandi) does not apply. The majority concludes that because Geringer gained access to the safe-deposit box after Mecello's death, the 1996 will had been traced out of Mecello's custody, making the presumption of revocation inapplicable.
The 1996 will was in Mecello's possession and control until her death. Before her death, the will was last seen in her possession, and at no point during her *904 lifetime was the will traced out of her possession and control. After Mecello's death, the will could not be found. The presumption is Mecello destroyed the will with the intent to revoke it, but I believe the presumption of revocation was rebutted.
When a will is shown to have been made and left in the custody of the testator, if it cannot be found after his or her death, the presumption is that the testator destroyed it animo revocandi. Muse v. Stewart, 173 Neb. 520, 113 N.W.2d 644 (1962). The fact that the will cannot be found is regarded as tending to show that the testator destroyed it animo revocandi. Id. Thus, the doctrine applies where a will was last seen in, or traced to, the decedent's possession, but cannot be found after his or her death. See, id.; In re Estate of Drake, 150 Neb. 568, 35 N.W.2d 417 (1948). See, e.g., In re Estate of Morgan, 389 Ill. 484, 59 N.E.2d 800 (1945); Stiles v. Brown, 380 So.2d 792 (Ala.1980); 79 Am.Jur.2d Wills § 606 (1975 & Cum.Supp.2001). See, generally, Williams v. Miles, 68 Neb. 463, 94 N.W. 705 (1903).
But the majority states that the presumption does not apply because the 1996 will was traced out of Mecello's control after her death. The majority notes that we have stated that if the will is traced out of the testator's custody, the burden is on the party who asserts a revocation to show that it came once more under the testator's control, or was destroyed by his or her direction. Williams v. Miles, supra. The majority then concludes that because Geringer gained access to Mecello's safe-deposit box after her death, the presumption of revocation does not apply because the will was traced out of Mecello's possession and the burden was on Geringer to prove that the will was revoked by Mecello. I find such a conclusion illogical.
When a will is traced out of the possession of the decedent during his or her lifetime and cannot be found after his or her death, it is logical that the presumption of revocation either would not apply or would apply with less force because it is the decedent's access to the will during his or her lifetime that provides the reason for the presumption to apply. If a testator had no access to the will, he or she would have been unable to destroy it with the intent to revoke it. See Hober v. McArdle, 173 Neb. 510, 113 N.W.2d 625 (1962).
But the majority's holding that the presumption does not apply when the will is traced out of the decedent's control after his or her death obliterates the doctrine of animo revocandi. When a person dies, he or she no longer has control over his or her property. Usually, someone is going to gain access to the property. In every case, a will can be traced out of the decedent's custody after death. Thus, the holding of the majority leaves no situation under which the presumption can ever apply.
In cases in which a party had access to a will after the testator's death, the issue is whether the presumption has been rebutted, and not whether it applies. See, e.g., Stiles v. Brown, supra. See, generally, 79 Am.Jur.2d, supra. Further, courts have analyzed this issue in terms of whether the presumption was rebutted even when an interested person had access to the will before the testator's death. See, e.g., Moore et al. v. Williams et al., 30 Tenn. App. 479, 207 S.W.2d 590 (1947); McClellan v. Owens, 335 Mo. 884, 74 S.W.2d 570 (1934). Indeed, in Muse v. Stewart, supra, we analyzed the issue in terms of whether the presumption had been rebutted when the proponents of a will contended that someone other than the decedent had access to and destroyed the will either before or after the decedent's death.
*905 Applying the above principles of law, I believe the presumption of revocation applies. Although Mecello is presumed to have destroyed the 1996 will with the intent to revoke it, this presumption is not conclusive and may be overcome by proper and sufficient proof that the testator did not revoke the will. Muse v. Stewart, 173 Neb. 520, 113 N.W.2d 644 (1962).
The evidence to overcome the presumption of revocation of a lost will must be clear, unequivocal, and convincing. Id. The burden is on the proponents, and the determination of the sufficiency of the evidence to overcome the presumption is for the court in the first instance. Id. But such a rule does not require evidence amounting to positive certainty, but only such as reasonably produces a moral conviction. In re Estate of Morgan, 389 Ill. 484, 59 N.E.2d 800 (1945). "[W]here the testimony all shows an attitude of mind and statements of the testator not only inconsistent with [a] revocation but contrary to it, courts are justified in concluding that the presumption has been rebutted." Id. at 489, 59 N.E.2d at 802. Thus, we have explained that the "presumption of destruction animo revocandi is one of fact only. It governs in the absence of circumstances tending to a different conclusion, but may be overcome by circumstantial or other evidence to the contrary." Williams v. Miles, 68 Neb. 463, 468, 94 N.W. 705, 707 (1903).
After the execution of the will, declarations of the testator are admissible for the purpose of proving that the testator did not destroy the will with the intention to revoke it. Id. See, also, Muse v. Stewart, supra. Also, the nature of the testator's relationship with beneficiaries of the will and with those challenging the will are admissible. See In re Estate of Morgan, supra. Proof that the testator felt kindly or loving toward the beneficiaries under the will carries weight and tends toward the conclusion of nonrevocation of the will by the testator. 79 Am.Jur.2d Wills § 628 (1975 & Cum.Supp.2001). See, generally, In re Estate of Morgan, supra. Although the mere fact that a will contestant had access to the will after the testator's death is not enough by itself to overcome the presumption, when such evidence is combined with other evidence that the testator did not destroy the will with the intent to revoke, the presumption can be overcome. See, Stiles v. Brown, 380 So.2d 792 (Ala. 1980); McClellan v. Owens, supra. See, generally, In re Estate of Brown, No. 01A01-9809-PB-00471, 1999 WL 802718 (Tenn.App. Oct.7, 1999) (reversing trial court's finding that presumption had not been overcome). Likewise, standing alone, evidence that a duplicate will was retained in the custody of another person generally cannot act to rebut the presumption of revocation but may be combined with other evidence to rebut the presumption. See, generally, Stiles v. Brown, supra. Finally, it is not incumbent on the proponents to show the exact manner in which, or the particular person by whom, the will was destroyed. McClellan v. Owens, supra. Rather, it simply must be shown under the evidence as a whole that the will was not destroyed by the testator with the intent to revoke it. Id. See, also, In re Estate of Morgan, 389 Ill. at 487, 59 N.E.2d at 801 ("it is not necessary that the court be able to determine what happened to a will if there is evidence that indicates it was not revoked or cancelled by the testator").
The Illinois Supreme Court found the presumption to be rebutted when a testator, shortly before death, made references to his will which indicated an unchanged attitude regarding the disposition of his property and when no evidence was provided to show why the testator would want to revoke his will. In re Estate of Morgan, *906 supra. The presumption has also been overcome when it was shown that others had access to the will, the testator had close relationships to the beneficiaries of the will, and other items where the will was kept had turned up missing. Moore et al. v. Williams et al., 30 Tenn.App. 479, 207 S.W.2d 590 (1947). Further, the presumption has been overcome when a contestant to the will had access to it, the testator's attorney kept a duplicate of the will, and the attorney told the testator that the duplicate must be destroyed if the testator ever desired to revoke the will. Stiles v. Brown, supra.
I believe that the evidence shows that Mecello did not destroy the 1996 will with the intent to revoke it and that the trial court was clearly wrong in determining that the presumption had not been rebutted. The record is replete with statements by Mecello that her will was in her safe-deposit box and that she desired Geringer to receive very little of her property. As the majority noted, 5 days before her death, Mecello told Mary Kitta that Geringer did not call or visit her. Mecello then stated to Mary Kitta that Geringer would be "a very surprised young man" because the will was signed, it was in the safe-deposit box, and the bank was going to handle it. Kitta testified that Mecello indicated to him that Geringer would get her house and nothing else.
Daryl Greger, a friend and neighbor of Mecello, testified that Mecello told him that she kept her will in her safe-deposit box. Greger also testified that Mecello was not very fond of Geringer and was reluctant to leave anything to him, but had mentioned that she would probably leave him the house and its contents. Shortly before her death, Mecello told Greger that she was leaving him her car. These statements are consistent with the terms of the 1996 will. Greger further testified that Mecello had once lost her keys to her safe-deposit box, had searched everywhere for them, and was extremely upset about the loss. The record reflects that on October 16, 1997, Mecello had the box redrilled and received new keys. Mecello told Greger that after she had the box redrilled, Geringer and his wife, Patricia Geringer, came to visit. Mecello told Greger that Patricia Geringer left the room for a period of time and that later that night, Mecello found the old safe-deposit box keys in plain sight inside a drawer.
Mary Ridge, Mecello's neighbor, testified that Mecello kept her will in her safe-deposit box. Ridge testified that in October or November 1998, Mecello told her that Geringer would be surprised that he was going to get the house but that it would have to be sold. Mecello told Ridge that she was also leaving money to different charities. These statements are also consistent with the terms of the 1996 will. Ridge urged Mecello to register her will at the courthouse, but Mecello said she was afraid that Patricia Geringer, who is an attorney, would find a way to read the will at the courthouse.
Beverly Callahan, another friend, testified that when Samuel Mecello died, Mecello stated that she assumed Geringer would "`get everything now.'" Callahan told Mecello that "`[h]e don't get it unless you say so, but you have to get a good lawyer and specify everything and make sure it was signed and put it in a safe place.'" Mecello responded to this by saying "`Safe place, I got. I got a safe deposit box.'" Mecello later told Callahan that she had made a will and had placed it in her safe-deposit box.
Yvonne Hager, a neighbor, testified that in October 1998, Mecello gave her some paintings of plates Mecello had painted and stated that Geringer and Patricia Geringer would probably come and take everything in the house when she died. Mecello indicated to Hager that she *907 did not want the Geringers to get everything. Mecello had spoken about her will to Hager in the past, but had not told Hager where it was. Hager was aware that Mecello had a safe-deposit box and stated how upset Mecello was when she lost the keys to the box.
After Mecello's death, Geringer gained access to the safe-deposit box after arranging to be appointed special administrator. In his application for appointment of special administrator, prepared by Patricia Geringer, Geringer represented to the county court that he was an interested person as defined by Neb.Rev.Stat. § 30-2209(21) (Cum.Supp.2000). Geringer then represented that he was named personal representative in the will or was otherwise a proper person to be appointed. But, at the time Geringer made these representations, he had not found a will. Further, Geringer's testimony shows that Mecello never told Geringer that he would be appointed personal representative under a will and never told him that she had a will. I note that under Neb.Rev.Stat. § 30-2457 (Reissue 1995), a special administrator may be appointed on the application of any interested person. Under the definitions in § 30-2209, a stepson is not an interested person. An heir can be an interested person, but Geringer does not qualify as an heir. In order to meet the requirements to be appointed special administrator, Geringer would be required to be a devisee under a will or a person with priority to be appointed personal representative. See § 30-2209(3), (18), and (21). At the time Geringer made the application for appointment of special administrator, he had no knowledge that he met either of those requirements, yet he nonetheless represented to the county court that he did. The appointment was informal, and no notice was given to interested persons. The record reflects that members of the Kitta family lived in the area and would have been interested persons under § 30-2209(21). These were the proper parties to apply for appointment as special administrator.
Geringer and Patricia Geringer were the only people present when the safe-deposit box was emptied. Geringer later failed to timely file an inventory of the contents of the safe-deposit box with the county court. On March 8, 1999, a motion for inventory was filed. The court filed an order for inventory and report of special administrator on June 1. On June 30, the court entered an order to show cause which ordered Geringer to file appropriate documents or be removed as special administrator. Geringer finally filed an inventory on July 15. Geringer did not list the 1991 will in the inventory. Geringer filed an amended inventory on August 24, which listed the 1991 will, but did not include the note Geringer alleges was attached to the will. The county court made a factual finding that the signature on the note did not resemble Mecello's signature on another document.
These facts rebut the presumption that Mecello destroyed the 1996 will with the intention to revoke it. The evidence clearly and convincingly supports the conclusion that 5 days before her death, Mecello still had a will in her safe-deposit box that she intended to have remain in effect. The record shows that Mecello was fond of certain beneficiaries under the will and continued to be close to those beneficiaries at the time of her death. Numerous witnesses testified regarding Mecello's desire to limit the property that was left to Geringer. No evidence has been provided to show that Mecello changed her mind in this regard. I further note that Mecello did not contact either attorney Kolenda or the named personal representative First National Bank and ask that copies of the 1996 will be destroyed.
The record does not support the conclusion that within the 5 days before her *908 death, Mecello changed her mind about her will, retrieved it from her safe-deposit box, and destroyed it. Rather, the record shows overwhelming support for the conclusion that Mecello had the 1996 will in her safe-deposit box and intended that it be in effect at the time of her death.
I believe Kitta has shown by clear and convincing evidence that Mecello did not destroy her will with the intent to revoke it and that the county court was clearly wrong when it determined otherwise. I would find that the presumption of revocation had been rebutted. After the presumption was rebutted, Geringer failed to sustain his position by a preponderance of the evidence. I would hold that the 1996 will could be admitted to probate if it was not revoked by a later instrument.
The majority did not address the effect of the note allegedly attached to the 1991 will which was dated May 9, 1998, and which stated, "This is my will.... All others are Revoked!" Neb.Rev.Stat. § 30-2332(1) (Reissue 1995) provides that a will is revoked "by a subsequent will which, as is evident either from its terms or from competent evidence of its terms, revokes the prior will or part expressly or by inconsistency." The county court found that the note was not listed on either of the inventories filed by Geringer and made a factual finding that the signature on the note did not resemble Mecello's signature on another document. The note attached to the 1991 will is not sufficient to revoke the 1996 will. I would reverse, and remand with directions to admit the 1996 will to probate. Accordingly, I concur.
HENDRY, C.J., and STEPHAN, J., join in this concurrence.